## EDWARD BALL v. JAMES A. YATES

29 So. (2nd) 729
November 29, 1946

June Term, 1946
En Banc

*Henry P. Adair* and *William H. Rogers,* for appellant.

*Robert H. Anderson, Charles E. Davis* and *Harry T. Gray,* for appellee.

BARNS, Circuit Judge:

This is a suit wherein the plaintiff sued the defendant upon an alleged oral contract alleged to have been made with the defendant through his agent, Suttles. Defendant denied the agency and ratification and plead the Statute of Frauds. The verdict and judgment were for the plaintiff and defendant appealed.

Hereinafter the Peninsular Securities Corporation will be referred to as "Peninsular". The Wakiki Beach Corporation will be referred to as "Waikiki", and the St. Johns Beach Development Company will be referred to as "St. Johns". The land encumbered by the mortgages involved will be referred to as the "beach tract". Marks, Marks and Holt, the holders or representing the holders of the second mortgage bonds, will be referred to as "Marks".

Before Peninsular sold its only asset, the beach tract, to Waikiki it was encumbered by a purchase money mortgage to William H. Rogers, as Trustee, dated June 1st, 1925 for $600,000.00, payable 3 years after date, with semi-annual installments of interest of $18,000.00 each, maturing December 1st and June 1st of each year. It was also encumbered by a second mortgage of like date to Farmer's Loan and Trust Company securing $125,000.00 of second mortgage bonds, maturing two years after date with semi-annual installments of interest of $3,750.00 each, maturing December 1st and June 1st of each year.

The second mortgage bonds are the bonds involved in this suit. $50,000.00 of them were owned by Marks, Marks and Holt and they represented the holders of others.

In December 1927 Mr. Young organized Waikiki Beach Corporation and that company, in December 1927 acquired the beach tract. The purchase price was $2,000,000.00, payable as follows: $725,000.00 by the written assumption of the first and second mortgages, $1,225,000.00 in third mortgage notes secured by a third mortgage on the property and $50,000.00 cash.

Of the cash payment Waikiki furnished none; $25,000.00 was loaned to Young by Suttles and $25,000.00 by Jacksonville Properties, Inc., the broker which effected the sale. The

second mortgage bondholders then waived and forgave two installments of interest, which had matured June 1st and December 1st, 1927. They also extended the maturity of the second mortgage bonds to June 1st, 1932.

By then Suttles had personally laid out $108,000.00 cash in the payment of former installments of interest and in other advances in the speculation. Waikiki owned no property except the beach tract encumbered by mortgages aggregating $1,950,000.00.

Suttles was President of "Peninsular" but the corporation was owned by J. J. Heard and by reason of prior transactions Suttles was a creditor of Heard to the extent of $108,000.00 resulting from dealings concerning this beach tract — and Suttles also has a one-third interest in the $200,000.00 in bonds of the third mortgage.

Suttles' interest as of June 1st, 1928 in the transaction was: $108,000.00 previously advanced to J. J. Heard of Peninsular; $25,000.00 cash advanced to Young and Waikiki; and $66,666.00, ⅓ interest in $200,000.00 third mortgage bonds, totaling $199,666.00.

*Young's "Waikiki" sale of Beach Tract to Ball's "St. Johns".*—Waikiki was unable to meet its first installment of semi-annual interest maturing June 1, 1928 upon the first and second mortgages. This brought about Suttles' attempt to sell the property to duPont interest represented by Ball.

Suttles offered the equity first for $250,000.00 and then for $100,000.00 subject to the three mortgages. Ball told him that (duPont's) Almours was not interested and finally said that he, Ball, might be personally interested enough to organize a corporation to take the title and make the payment of interest that Suttles said would mature around June 1, 1928.

As a result of Suttles negotiations, Ball and Young agreed that Young would have Waikiki transfer the title to the property to a corporation which Ball would organize, that Ball would pay the interest on the first and second mortgages that matured on June 1, 1928 and give to him, or his company, Waikiki, the right within 60 days to redeem and take title to the property. It was not redeemed.

*Suttles' deal with Marks re 2nd Mortgage Bonds.*—Suttles appears to have advised Marks that the duPont interests— or Ball—had become interested and they would immediately organize a corporation that would be adequately capitalized to take over the tract; that if given the time and opportunity, the new company would take title to the property; that if the bondholders would "sit still in the boat" and not precipitate the maturity of their obligations nor foreclose their mortgage and would accept a delayed payment of their interest when the corporation was formed and would cooperate in a foreclosure suit to clear the title of the property of all liens subordinate to their mortgage then Ball would pay the overdue interest (as well as that on the first mortgage), and meet all future installments of interest and make the second mortgage bonds "as good as Government Bonds". Marks said he would wait, and did.

A statement that an act would be done is not essentially a promise to do it, and not all promises are contractual.

Ball organized the new corporation, St. Johns Beach Development Company. All the common stock was issued to him except a qualifying share each to the dummy directors. All the preferred stock that was issued was in Ball's name.

The St. Johns took title to the property from Waikiki and Ball furnished it the money to pay the interest on the first mortgage amounting to $18,000.00 and the interest on the second mortgage amounting to $3,750.00, which it paid. The check for the second mortgage interest was brought to Marks by Suttles, on June 11, 1928.

*Ball—Peninsular deal.*—About June 9th, 1928 negotiations were had between Peninsular and Ball with respective to the Beach Tract. Suttles made a proposal on behalf of Peninsular. It was, in effect, that Peninsular would trade to Ball $1,025,000.00 par value of the third mortgage notes in exchange for $763,000.00 par value preferred stock of the corporation which Ball was to form. Ball accepted.

The acquisition of the beach tract by St. Johns and the exchange of Ball's preferred stock in St. Johns for the third mortgage bonds took place about at the same time—June 1928.

The facts clearly establish that Suttles was prompted in his initial actions in going to Ball in May and June 1928 by his fear of a default by Waikiki and his prior advances. He wanted some people with money to take over the property in order that his own personal interest might be protected.

Ball as an investor and Suttles as a broker had done business before—Ball was interested in the tract.

Ball, realizing the situation with Waikiki defaulting and with the knowledge that default by Waikiki as owner of the tract would jeopardize Peninsular's third mortgage by the hazard of the foreclosure of the first or second mortgages, doubtless conceived the idea of negotiating with Waikiki to get the title to the property and of negotiating with Peninsular to exchange their third mortgage bonds for preferred stock in the corporation to be organized to acquire title. With these ideas in mind he likely told Suttles to tell Marks that he would make arrangements whereby he would take over the property and make good the interest on the second mortgage bonds which Marks controlled or represented. If he made good the interest on the second mortgage bonds he would of course protect his own interest by paying the interest on the first mortgage bonds which would as an incident thereto likewise protect the second mortgage as against the first mortgage.

Ball proceeded to acquire the tract by Waikiki conveying to St. Johns. Peninsular exchanged its third mortgage for preferred stock in the St. Johns. Ball paid nothing for the preferred stock which was issued to him and which he exchanged for the third mortgage bonds in St. Johns but claimed them as his own.

By this suit it is the attempt of plaintiff to impute from the facts and circumstances agency to Suttles with Ball as the principal and from the facts and circumstances to impute a binding promise by Ball through Suttles as agent to pay the second mortgage bonds held and controlled by Marks.

"When one deals with a special agent or an agent who has only special authority to act for his principal, he acts at his peril, for he must acquaint himself with the strict extent of the agent's authority and deal with the agent accordingly.

Such third person must inquire into the extent of the agent's authority; he is not justified in relying upon any appearance of authority except that which is directly deducible from the nature of the authority actually conferred." 2 Am. Jur. p. 77, 8, Agency 96.

It is evident that Suttles wanted the property saved from foreclosure. It is apparent that Marks had no desire to foreclose. It is also apparent that Ball had no intention of burdening himself or his one-man corporation (St. Johns) with a promise to pay other than the specified installments of interest. It appears that on each occasion when confronted with any suggestion that he had entered into any agreement of a contractual nature, other than with Waikiki and Peninsular, that he disaffirmed and disavowed. He states his plan was to proceed so that he could quit at any time without liability and his conduct throughout bears this out.

We are of the opinion that the evidence fails to establish facts sufficient to permit an inference that Suttles was the authorized agent of Ball and likewise it is not sufficient to establish ratification. The various acts and doings of Ball were such as he had a right to do, independent of agency. They were in nowise dependent upon the existence of agency and under the facts and circumstances ratification will not be implied as a matter of law. Every act of Ball was consistent with Suttles not being his constituted agent and no act of Ball was dependent on Suttles being Ball's agent. Ball also disavowed the agency of Suttles. The acts tending to imply ratification are accounted for by the showing that they were in advancement of expressed or written obligations or were otherwise not dependent on any purported act of agency by Suttles.

Before ratification will be implied of an act of an unauthorized agent it must be made to appear that the principal has been fully informed and that he has approved.

The evidential factors tending to establish a *contract* between Ball and Marks occurred on or before June 1st, 1928 and the factors evidencing ratification occurred after that date.

The evidence fails to support an enforceable contract between Ball and Marks prior to June 1st, 1928 and likewise the evidence fails to establish ratification subsequent thereto.

It is likewise apparent that the debt sought to be enforced is that of Peninsular to Marks—the second mortgage bonds. The evidence is insufficient to establish that this debt ever became the debt of Ball. The evidence is likewise insufficient to establish that Ball ever made a "special promise" in writing to "answer" for this debt of the Peninsular or otherwise placed himself within the exactions of the statute of Frauds (Sec. 725.01, Florida Statutes 1941, F.S.A.) so as to incur liability for the "debt, default or miscarriage" of Peninsular on the second mortgage bonds held by Marks.

The pertinent provisions of the statute of Florida being, "No action shall be brought . . . whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by him thereunto lawfully authorized." 725.01 Florida Statutes, 1941.

Upon the first trial reviewed in the first appeal, Yates v. Ball, 132 Fla. 132, 181 So. 341, the trial court had directed a verdict for the defendant at the close of plaintiff's case and the question there was whether or not the evidence adduced in support of the allegations of the declaration were sufficient to support a verdict for plaintiff and this court on appeal held that the evidence presented by the plaintiff was sufficient to establish a prima facie case against the defendant and that it was error for the trial court to direct a verdict for the defendant.

In the second appeal (145 Fla. 537, 200 So. 701) the plaintiff procured a verdict which was reversed and the opinion recited that "the verdict is not supported by the evidence adduced in support of the allegations of the declaration." If to be taken literally this language was inadvertent. The question then before the court was not whether the evidence adduced in support of the allegations of the declaration was

sufficient, but whether the evidence adduced as an entirety supported the verdict. It was the court's conclusion that it did not.

The law of the case is fixed by issues actually adjudicated on appeal and does not extend to such issues as might have properly been adjudicated. If there be any conflict between the law of the case as established by the first appeal with the law of the case as established by the second appeal then in that event the latter will control over the first.

We find that the trial court erred in not directing a verdict for the defendant after all the evidence was in.

Upon the going down of the mandate the lower court shall make inquiry of the counsel of record of the respective parties as to whether or not there will be evidence available on a further trial of this cause which would add substantially to the strength of the plaintiff's case. If it shall appear as the result of such inquiry that upon another trial the evidence to be adduced would be substantially the same as that submitted at the trial hereby reviewed, then and in that event, the trial court shall thereupon so adjudge and enter a judgment for the defendant.

Reversed with directions.

BROWN, BUFORD, THOMAS and ADAMS, JJ., concur.

CHAPMAN, C.J., and TERRELL J., dissent.

BUFORD, J., concurring specially:

I concur in the opinion and judgment prepared by Judge BARNS, however, I find an additional reason for reversing the judgment.

The additional reason is that I find in the record no evidence that there was ever any meeting of the minds of the parties as to a contract or agreement whereby the defendant Ball would thereafter "at all times meet the payments of principal and interest to become due on said second issue of bonds and would give protection to said bonds against the first mortgage bonds so that the second issue of bonds would be made good in all respects and so that the holders of the second issue would need have no further concern about the ultimate payment of their bonds."

This was a material allegation of the declaration and was unsupported by the evidence.

BROWN and THOMAS, JJ., and BARNS, Associate Justice, concur.

(ON SUGGESTION FOR DISQUALIFICATION)

Opinion filed February 28, 1947

PER CURIAM:

In a supplement to his petition for rehearing appellee suggests the disqualification of Justices BUFORD and ADAMS, and that they "recuse themselves or, in the alternative, that the Court hold that they are disqualified to participate in these proceedings."

Justices BUFORD and ADAMS have voluntarily filed a statement relating to the facts upon which disqualification is sought, and have asked the Court to pass on the "suggestion". Each has announced to the Court that if he were found disqualified from the facts contained in the suggestion, or otherwise, when considered together with the legal controversy before the Court, or if the Court should find that the conduct of either has indicated any hostility toward the interest of appellee as charged in the suggestion other than an adverse judicial ruling or conclusion, to so adjudicate, and that they would be governed accordingly.

The suggestion alleges that the DuPont interests own and control numerous banks in Florida, including the Florida National Bank in Jacksonville, and the Florida Bank in Ft. Pierce; that appellant's counsel, Messrs. H. P. Adair and William H. Rogers, are both directors of the Florida National at Jacksonville and have been so for a number of years; and that Mr. Ball, the appellant, is on the Board of Directors of said Jacksonville Bank and President of the St. Joe Paper Company; that Ball is the dominating and controlling trustee of the DuPont Estate which in turn owns or controls said institutions.

Under the statute a judge may be disqualified to sit in a cause (1) if he is a party thereto, (2) if he is related by consanguinity or affinity within the third degree to one of the parties thereto, (3) if he is a material witness for or against one of the parties thereto, or (4) if he is prejudiced

against or biased in favor of either of the parties or interested in the outcome of the litigation. F.S. Sec. 38.01-10 F.S.A.

The suggestion of disqualification in this instance is upon the ground of prejudice and bias. The policy of the law as expressed in the statute is that suggestion of disqualifications shall be filed before the trial and before decisions are rendered and not afterward unless the delay is excused by good cause shown.

The law requires that the party litigant file an affidavit that he fears he will not receive a fair trial and that the grounds of disqualification be supported by the affidavit of two reputable citizens not of kin or of counsel for the defendant [party].

A ground for bias on behalf of Justice BUFORD is that he was a lessee for a period of ten (10) years of oil rights of the St. Joe Paper Company in certain land. Appellee fails to state what the public records of the county show as to the present status of said lease — and if surrendered when surrendered.

This lease was made April 10th, 1944, and recorded in the public records of Leon County on August 29, 1944. It provided that the lessee should pay a rental of 10 cents an acre except that the drilling of a well would suspend payment for six months. It also provides for the payment of royalties for gas produced and delivery to the lessor of ⅛ part of the oil produced.

This appellee has termed this a "joint adventure" which it is not. The lessor's interest was in receiving his rent of 10 cents per acre or else that of having wells drilled for oil on his land and receiving a portion of the oil as rent. The lessee's interest was in having the privilege of taking oil and gas from plaintiff's land. There was no joint or mutual interest. The lessee was to pay and the lessor was to receive. Their interests were adverse and not joint as suggested; but of course they both wanted oil and gas but there is none and even if oil were produced their interest would be separate and not joint.

Appellee further alleges upon information and belief that while a prior appeal was pending in this case (circa 1940) appellant employed an attorney who was a friend of Justice BUFORD. Such attorney did not appear in that appeal and neither has he appeared in this appeal and neither does it appear for what purpose such attorney was employed, nor is it in anywise shown or suggested that Justice BUFORD has ever known of such employment prior to the filing of this suggestion.

It is further stated that at a time after the rendering of the judgment of the trial court (3-8-45) now on appeal but before the appeal (9-27-45) of the judgment to this Court that Justice ADAMS borrowed money from the Florida National Bank of Jacksonville (6-29-45) secured by a mortgage on real estate and personal property in St. Lucie County and that such mortgage was satisfied before maturity.

It is further alleged that on December 4, 1946, Justice ADAMS and Irlo Bronson borrowed $30,000.00 from the Florida Bank of Ft. Pierce, Florida and secured it by a mortgage on real property in St. Lucie County; that said mortgage is payable $400.00 per month and the balance of $15,600.00 payable January 10th, 1950.

Appellee states that he did not discover the existence of lease and mortgages of record until after he had filed his petition for rehearing; that he does not question the right of either Justice BUFORD or ADAMS to either lease or mortgage their property as above stated, but having done so, questions their right to sit in judgment herein.

We have examined the "suggestion" and considered same together with the record of the case and the proceedings therein before this Court, and it is our conclusion and judgment that in fact and in law, it is inadequate and insufficient in substance, and we are unmindful of any hostility exemplified at any time toward the interest of appellee.

When no disqualification is shown the matter of voluntary recusation is not for the Court to decide, but in each instance for the individual Judge or Justice to determine according to the circumstances. At times he may voluntarily recuse him-

self merely because he feels that it would be better policy and for like reasons he may fail to do so.

When recusation is requested by an unsuccessful litigant after the Judge or Justice has rendered or participated in a judgment or decision adverse to the party requesting it, and there is no disqualification, the problem or propriety of voluntarily retiring is made more acute and more difficult to decide. The law does not favor the substitution of a Judge or Justice in a cause after decision which essentially carries a benefit to the successful party, yet it favors judges lending themselves to promoting confidence in the Court's acts when no injustice will be worked thereby.

The suggestion is overruled.

THOMAS, C.J., TERRELL, CHAPMAN and BARNS, JJ., and FABISINSKI, Associate Justice, concur.

STATEMENT OF JUSTICE RIVERS BUFORD IN RE SUGGESTION OF DISQUALIFICATION—HOLDING THE SUGGESTION INSUFFICIENT AND HOLDING HIMSELF NOT DISQUALIFIED.

To the Chief Justice and The Justices
of the Supreme Court of Florida:

On Saturday, February 1st 1947, the appellee filed here a document suggesting the disqualification of myself and Mr. Justice Alto Adams to participate in the disposition of the above styled cause, alleging that my disqualification had existed since April 10th, 1944, by reason of a certain transaction involving an oil and gas lease executed by St. Joe Paper Company to me.

It is my opinion that the allegations of the suggestion of disqualification are entirely insufficient to show grounds for disqualification. However, I shall frankly state the facts which apparently constitute the basis for the innuendoes contained in the suggestion and explain the entire transaction, in the hope that everyone may be satisfied.

I am conscious of no bias or prejudice for or against either party to this suit and there is no logical reason for anyone to assume that either exists. The record shows that my position and opinion has been consistently the same from the first

appearance of this case here to date. See Yates v. Ball, 132 Fla. 132, 181 Sou. 341, opinion filed October 13th 1937; Ball v. Yates, 145 Fla. 537, 200 Sou. 695, opinion filed May 3rd 1940, and Ball v. Yates, opinion filed November 29 1946.

I attach hereto, and make a part hereof, copies of documents which constituted all the contracts and agreements connected with the Oil and Gas Lease from St. Joe Paper Company to me executed on April 10th, 1944, as follows:

1. Escrow Agreement between St. Joe Paper Company and Rivers Buford. (This Escrow Agreement is along identical lines as those entered into between me and Lloyd Brown as Lessee, and V. G. Phillips, Phillips Turpentine Company, Wakulla Turpentine Company and others, as Lessors, under which a test well was being drilled when this contract was made. In fact, the Phillips Escrow Agreement was used as a model or pattern in drafting this Escrow Agreement. The Phillips tract adjoined this tract.)

2. Original Lease dated July 17th, 1943.

3. First Extension Agreement.

4. Second Extension Agreement.

5. Lease dated April 10th, 1944, modified to meet Stanolind's requirements and substituted in escrow in lieu of original Lease.

6. Contract between Buford and Stanolind Oil and Gas Company dated April 12th 1944, with documents attached. (The conditions of the Escrow Agreement were performed and Lease from St. Joe Paper Company to Buford and assignment from Buford to Stanolind were delivered on August 29th 1944.)

7. Assignment of Oil and Gas Lease to Standolind Oil and Gas Company dated August 29th 1944.

8. Release of all interest in and under Oil and Gas Lease of April 10th 1944 and made by Stanolind Oil and Gas Company executed on the 7th day of September, 1945, after completing well to required depth and abandoning same as dry hole, on November 20th 1944.

9. Release by Rivers Buford made prior to April 10th 1946 to St. Joe Paper Company of all lands covered by lease of

April 10th 1944 except 2749 acres in Jefferson County as to which Buford exercised the option, provided in the lease, to retain under the lease by paying the annual renewal rentals of 10¢ per acre for each acre so retained.

On April 3rd 1945 I paid rentals on the 5229 acres reserved from the Stanolind Assignment. My associate, Wm. L. Less, paid the rentals April, 1946, on the 2749 acres amounting to $274.90. Thus, we have paid renewal rentals as required by the lease since Stanolind completed and abandoned the well in the sum of $797.80.

We have never been under any financial or other obligation to St. Joe Paper Company or to anyone else in connection therewith. There has never been any fiduciary relation between me and St. Joe Paper Company or between me and Mr. Ball. I have no intimate acquaintance with Mr. Ball and our association has been only casual. He has called on me at my office or chambers three (3) times in the last 15 years but only in a social way, but he has not called on me at all within the last two (2) years. He has never either directly or indirectly discussed, or attempted to discuss, any law suit of any sort with me. There is nothing either unusual or unseemly about such calls or visits as Mr. Ball has made to me. Hundreds of laymen in all walks of life call on and visit with me each year. My doors are closed to no citizen who may wish to call on me. They are all welcome.

During the past 25 years I have believed that Florida has great potentiality as an oil-producing State and I have endeavored to encourage exploration which would develop this great natural resource and to this end I have acquired many oil and gas leases from various land owners, including St. Joe Paper Company and St. Joseph Land & Development Company. In all cases I have given full consideration under the then prevailing price in the area involved and under the usual terms applying to such transactions just as one would go to a store and buy a suit of clothes, or to a land-owner and buy a house or a farm, or to a bank and buy bonds or stocks. These transactions have been more in the nature of a hobby and recreation than as a business or vocation and I have at no

time allowed these activities to .interfere with the prompt and fair performance of my official duties.

These transactions have involved no special favors and no fiduciary relations between me and any of such land owners, or those acting for them.

As to the innuendo contained in the suggestion in reference to the employment of Mr. H. H. Wells by Mr. Ball—I think it hardly deserves notice but I will say that Mr. Wells and I have been friends for more than forty years but our association has been of only a social nature and I do not think he entertains any idea that he could ever control or influence my official action in regard to the result of litigation by reason of our friendly relations, and I am positive that he could not do so. What fee Mr. Ball may have paid him or for what services such fees were paid are matters in which I have no interest. I do know, in a general way, that he has represented Mr. Ball as an attorney during the past fifteen years. I am confident that Mr. Wells would not represent to Mr. Ball that he could influence, except in an ethical manner, the action of any member of this Court. I consider Mr. Wells a member of the Bar of high honor and integrity.

If I were disqualified, for any reason, in the Ball v. Yates case I would have willingly recused myself but, as no disqualification is shown or in fact exists, it is my duty to participate in the disposition of it. See Austin v. Lambert, 11 Cal. (2nd) 73, 77 Pac. (2nd) 849; State ex rel Palmer v. Atkinson, 116 Fla. 366, 156 Sou. 726.

In the Atkinson case we held:

"Circuit Judge who is eligible and competent to sit in cause has duty to exercise judicial functions therein and to make all necessary orders and decrees, regardless of personal embarrassment or other considerations where these do not amount to legal disqualification.

"Mandamus will lie to compel qualified judge to proceed with legal impediment to his judicially acting in cause."

Respectfully,

/s/ Rivers Buford
Justice Supreme Court

RBj

Tallahassee, Florida
February 3, 1947

A suggestion of my disqualification has been filed in the above case because of two mortgages given by me to secure an indebtedness of $80,000.00 to the Florida National Bank of Jacksonville and $30,000.00 to the Florida Bank of Fort Pierce. I am conscious of no bias or prejudice as a result of these mortgages, or otherwise, which would preclude me from continuing in this case.

The question of my disqualification, however, is one that I prefer the other members of the Court to determine now that the challenge has been made.

In fairness to the Court, I will say that the $80,000.00 mortgage was paid in full January 10, 1946, before the due date, and long before this case came before me. The $30,000.00 is not due and is outstanding.

Both of these mortgages were more than triply secured. They required the usual rate of interest of 4% per annum on the class of loans such as these. At no time have I been, even remotely, conscious of any favor being extended to me, directly or indirectly, by these lending agencies or any other person or persons.

In the interest of public policy, I earnestly urge the Court to direct its Clerk, or any other agency, to conduct a thorough examination of all my books and records in order to remove any question which might reflect on this honorable Court.

Respectfully submitted,

/s/ Alto Adams

Alto Adams

Opinion filed March 28, 1947.

ON PETITION FOR REHEARING

BARNS, J.:

Because of the emphasis which has been placed in the petition for rehearing on the "doctrine of the law of the case" it seems appropriate to review briefly the history of this litigation.

In its first appearance here, the court reviewed a judgment in favor of the defendant (appellant in the instant appeal)

whose motion for a directed verdict at the close of the plaintiff's case had been granted. The author of the opinion discussed the "one-year" provision of the statute of frauds, but did not discuss the provision that a promise to pay the debt of another should be evidenced by a memorandum signed by the party to be charged. This decision appears under the title of Yates v. Ball in 132 Fla. 132, 181 So. 341.

The statute relative to directed verdicts (Sections 4363, Complied General Laws, 1927) provided that:

"If . . . after all the evidence shall have been submitted on behalf of the plaintiff in any civil case . . . it be apparent to the judge of the circuit court . . . that *no evidence* has been submitted upon which the jury could lawfully find a verdict for the plaintiff . . . the judge shall upon motion of the defendant direct the jury to find a verdict for the defendant . . ." (Underscoring supplied)

So, applying the statute to the action of the circuit judge, it is obvious that he held the view that the plaintiff had offered no evidence upon which the jury could lawfully find for the plaintiff.

When the case was reversed in the opinion just cited, it was retried, and on this trial both plaintiff and defendant introduced evidence. The plaintiff prevailed, and the matter was brought to this court for the second time, where it was disposed of by a per curiam opinion reciting that "the picture of the transaction [is] now complete," and expressing the view that "the verdict is not supported by the evidence adduced in support of the allegations of the declaration and the motion for a new trial should have been granted . . ."

Ball v. Yates, 145 Fla. 537, 200 So. 701.

The reference in the opinion to the completeness of the picture suggests the latter part of the statute, Section 4363, supra, now designated as Section 54.17, Laws of Florida, 1941, and F.S.A., further providing that:

"If, after *all the evidence* of the parties shall have been submitted, it be apparent to the judge of the circuit court . . . that no *sufficient evidence* has been submitted upon which the jury could legally find a verdict for one party, the judge

may direct the jury to find a verdict for the opposite party." (Underscoring supplied).

To summarize, when the matter was first heard here on appeal, the first quoted part of the statute had been applied by the trial judge; and when it made its second appearance here, the last quoted portion of the statute had been invoked.

When the matter was last considered it had not been established that the testimony introduced in the third trial was materially different from that introduced in the second trial, which we had said did not support the verdict for the plaintiff.

The "law of the case" has to do with questions of "law" decided on appeal as applied to subsequent proceedings of the case.

". . . The decisions agree that as a general rule, when an appellate court passes upon a question and remands the cause for further proceedings, the question there settled becomes the 'law of the case' upon a subsequent appeal, provided the same facts and issues which were determined in the previous appeal are involved in the second appeal. But if the facts are different, so that the principles of law announced on the first appeal are not applicable, as where there are material changes in the evidence, pleadings, or findings, a prior decision is not conclusive upon questions presented on the subsequent appeal; and the original proceedings are before the court on a second appeal so far as it is necessary to determine any new points in controversy between the parties which were not terminated by the original decree." 3 Am. Jur. Sec. 985.

We find no departure from this doctrine by either the trial court or this court.

When the litigation reached here the third time, the appellant had filed an extensive brief on ten points of law. Appellee then moved to strike the first nine of them, and the court, with the exception of one member who was disqualified, unanimously agreed that points three, four, and five should be stricken. These points involved the three-year statute of limitations, the "one-year provision of the Statute of Frauds," and the "debt-of-another" provision of the statute.

Upon a reconsideration of this order, the six members of the court then sitting, one having been disqualified, decided unanimously that that part of the brief pertaining to point five dealing with the "debt-of-another provision of the Statute of Frauds" should not be stricken, stating in the order that "the Court withholds its judgment for the purpose of permitting the said point to be argued when the cause is argued on the merits; it will then be finally considered and adjudiciated." Two members of the court held the view that the parts of the brief referring to points three and four should also be retained and those matters considered by the court.

It is patent that as late as this order, entered on the eve of the argument and consideration of the litigation for the third time, every member of this court held the view that the issue hinging on the "debt-of-another" provision of the statute of frauds was one which remained to be decided.

In the last opinion a majority of the court held, among other things, that there was not sufficient testimony to show that the defendant had ever promised in writing to pay a debt of another and was not, therefore, in view of the provisions of the statute of frauds, responsible to the plaintiff.

In all the circumstances of this case it appeared to a majority of this court that another reversal is proper and just and nothing has been presented in the petition for rehearing which warrants an abandonment of that view.

Rehearing denied.

THOMAS, C.J., BUFORD and ADAMS, JJ., concur.

TERRELL and CHAPMAN, JJ., dissent.

TERRELL, J. dissenting:

I think the rehearing should be granted. In the first appeal, Yates v. Ball, 132 Fla. 132, 181 So. 341, we held that the essential elements of the contract declared on were proven, that there was no material variance between allegata and probata, that there was ample showing of authority on the part of Ball's agent to act for him and that the issue when all evidence was in, was one for the jury to determine. In fine the law of the case was settled on the first appeal. Provi-

dent Life and Accident Insurance Co. v. Mathers, 157 Fla. 661, 26, So. (2) 814.

The rule in this state is that on a subsequent appeal the appellate Court will not reverse what it has heretofore decided to be the law of the case. Family Loan Co. v. Smetal Corporation, 123 Fla. 900, 169 So. 48. Neither has this Court power to substitute its judgment for that of the jury. Two juries have passed on the evidence in this case and have reached similar verdicts. Southern Express Co. v. Stovall, 75 Fla. 1, 77 So. 618.

I do not understand the reversal in second appeal to have been on the ground that the evidence would not support an affirmative verdict under any circumstances. I thought that the interests of all parties under the circumstances, would be better served by letting another jury pass on the evidence. That has been done and I think the verdict and judgment should stand.

The rehearing should be granted and the judgment appealed from should be affirmed.

CHAPMAN, J., concurs.