BENTON, J.
Richard Kearney appeals the amended final judgment entered in the dissolution of his marriage to Bernadette Kearney, who has filed a cross-appeal. Except as to the amended final judgment’s denial of credit for fees and costs Mr. Kearney had previously paid under an interim order, we affirm both on the appeal and on the cross-appeal.
Now the parents of four children, the parties married in 1987. After Mr. Kear-ney moved out of the marital home in April of 2007, Ms. Kearney filed a petition for dissolution of marriage on November 6, 2008. On November 15, 2010, the trial court entered its bifurcated final judgment of dissolution of marriage, and the parties subsequently filed three partial settlement agreements addressing equitable division of property they agreed was marital.
Early on in the marriage (in 1989, using Ms. Kearney’s credit card) the parties purchased what was then a much smaller business, Mainline Information Systems, Inc. (Mainline). On July 19, 2006, at Mr. Kear-ney’s request, Ms. Kearney signed an agreement (Mainline Agreement) ostensibly relinquishing her interest in Mainline, in exchange for three million dollars to be paid in annual million-dollar installments. But, after the first of two bench trials (held October 26-29, 2009), the original trial judge entered a 44-page order on March 80, 2010, invalidating the Mainline Agreement, at Ms. Kearney’s behest. As a corollary, the trial court ruled that Mainline should be treated as a marital asset subject, like the parties’ other marital assets, to equitable distribution in the parties’ dissolution proceeding.
Later the original trial judge recused herself, and Mr. Kearney sought reconsideration of the order invalidating the Mainline Agreement. His motion for reconsideration remained pending when the parties’ third partial settlement agreement was reached.[1] The third partial settlement agreement, adopted by trial court order entered on July 13, 2011, memorialized the parties’ agreement “with respect to all remaining assets and issues,” except issues regarding Mainline’s value and what portion of its value (if any) was attributable to Mr. Kearney’s “active management” subsequent to November 6, 2008; and except whether (notwithstanding the order originally entered on the question as to which rehearing was subsequently denied) the Mainline Agreement was valid and enforceable.
A second bench trial (held August 8-12 and August 18-22, 2011) had primarily to do with the valuation of Mainline, and resulted in a lengthy order that fixed the value of Mainline at $48,063,800, explicated the rationale for the trial court’s appraisal, and allocated Mainline’s value equally between the parties. The trial court also rejected Ms. Kearney’s claim for prejudgment interest (which she sought for the period from the filing of the petition for dissolution until entry of final judgment) *384 based on the value of her half of Mainline. In addition, Mr. Kearney was ordered to reimburse Ms. Kearney $797,223.06 for expenses and fees she incurred in (re)litigating whether the Mainline Agreement was valid and enforceable.
On appeal, Mr. Kearney first argues that the order invalidating the Mainline Agreement (which was not disturbed on rehearing) should be reversed. He points to evidence that Ms. Kearney consulted two attorneys before she signed, and argues that she was fully competent and informed at the time she did so. He contends the trial judge’s determinations that Ms. Kearney did not freely and knowingly sign the Mainline Agreement — and that she acted without even “approximate” knowledge of Mainline’s value — lack competent, substantial evidence in support, and that the order setting the Mainline Agreement aside was contrary to law.
We are not unaware of evidence that could support Mr. Kearney’s view. Ms. Kearney did consult two lawyers, both of whom advised her not to sign the Mainline Agreement,[2] and the evidence suggests that she did not (and presumably does not) have any particular intellectual or psycho-logieal problems.[3] But the rule is that postnuptial agreements governing disposition of the parties’ assets are not enforceable if entered into in the absence of full and fair disclosure of the assets at issue, and the trial court’s findings that such disclosure did not occur are binding on us, given the evidence adduced below.
The trial judge found that, when Mr. Kearney presented the draft agreement to his wife, he encouraged her to engage independent legal counsel, but told her not to heed any advice counsel might give not to sign; he told her that lawyers would try to talk her out of signing the agreement because they would not understand what it was intended to accomplish. He told Ms. Kearney that Mainline’s ability to move forward with a “recapitalization transaction” depended on her signing the Mainline Agreement. Ms. Kearney testified that Mr. Kearney never identified the three million dollars payable under the Mainline Agreement as payment for a sale of her interest in Mainline. She testified, “He did say that it would be separate from Mainline and it would be mine, so that on the off-chance that Mainline couldn’t repay *385 their loan that this money would be safe from anybody coming after it.”
The original trial judge found that the primary purpose of the proposed recapitalization was, in fact, to provide $100 million for distribution to Mr. Kearney, and that new capital investment in Mainline would not have exceeded $3.9 million under the proposed “recapitalization transaction.” Judge Caloca-Johnson also found that neither of the other parties who contemplated participating in the transaction ever suggested Mr. Kearney needed to ask Ms. Kearney to relinquish her interest in Mainline.[4]
The original trial judge found that the parties’ financial holdings and income are complicated,[5] to begin with, and that the financial disclosures of income and assets attached to the agreement were unclear and ambiguous.[6] The original trial judge found the husband misstated in significant and material respects the identity, nature, and value of the parties’ other (non-Mainline) marital assets (overstating the value by approximately 40% or $14 million, thus exaggerating their significance — and understating Mainline’s significance — in the overall distribution scheme). On the other hand, the husband’s financial statement omitted significant sums payable to the husband individually, including notes and receivables aggregating approximately $6.5 million. In addition to other misinformation about Mainline’s worth, Mr. Kearney’s financial statement misstated the income he received from Mainline: He revised a financial statement prepared by his accountant to reduce his stated income (total compensation by Mainline) from in excess of $6 million annually[7] to approximately $712,000 annually.
Concluding the totality of the circumstances suggested overreaching and mis *386 representation on the part of Mr. Kearney, the original trial judge did not find genuine, informed consent to the agreement on the part of Ms. Kearney, noting he had “inoculated” her against any advice from independent counsel by telling her the advice would be the product of their lack of understanding. The original trial judge found Mr. Kearney knew she would sign any business-related document he asked her to without question, and that he told her he would have to sell stock in Mainline if she did not sign the agreement.
Because “parties to a marriage are not dealing at arm’s length,” the Florida Supreme Court directs trial judges to “carefully examine the circumstances to determine the validity of these agreements.” Casto [v. Casto], 508 So.2d [330, 334 (Fla.1987)]. In other words, where, as here, the postnuptial agreement is made prior to full-fledged litigation over dissolution of marriage, the parties have a fiduciary relationship. See Macar v. Macar, 803 So.2d 707, 712 (Fla.2001). Because of this special relationship, a trial court may vacate a post-nuptial agreement on one of the following grounds:
(1) The agreement was reached as the result of fraud, deceit, duress, coercion, misrepresentation, or overreaching.
(2) The agreement was unfair or unreasonable, given the circumstances of the parties.
Casto, 508 So.2d at 333. The extensive order invalidating the Mainline Agreement demonstrates the original trial judge correctly applied the tests for determining the validity of a postnuptial agreement set forth in Casto. In the order on Mr. Kear-ney’s motion for rehearing, the successor trial judge understandably found no basis for disturbing the order invalidating the Mainline Agreement.
In concluding the Mainline Agreement was invalid based on overreaching and misrepresentation, the trial judge found numerous misrepresentations and failures to disclose on the part of Mr. Kearney. The trial judge also found the agreement was unfair and unreasonable, citing pressure surrounding the signing of the agreement, the value of the parties’ respective interests,[8] the disparity between the business experience of the parties, and the emotional pressure and misinformation from Mr. Kearney; that Mr. Kearney’s disclosure to Ms. Kearney was neither full nor fair; and that Ms. Kearney did not have approximate knowledge of the marital assets and liabilities at the time she signed the Agreement. These findings are supported by competent, substantial evidence. See McNamara v. McNamara, 40 So.3d 78, 82 (Fla. 5th DCA 2010) (“The questions of whether a challenging spouse had some understanding of his or her rights, and had or reasonably should have had, a general and approximate knowledge of the proponent’s property, are matters of fact to be determined by the trial court *387 upon the evidence, and its finding will not lightly be disturbed.”); Gordon v. Gordon, 25 So.3d 615, 616 (Fla. 4th DCA 2009) (“A trial' court’s findings on a motion to set aside a prenuptial agreement should not be disturbed absent a showing that the findings are not supported by competent, substantial evidence.”).
Mr. Kearney also argues that, even if Ms. Kearney was not adequately apprised of the parties’ finances when she originally signed the Mainline Agreement, the trial judge erred in rejecting his contention that Ms. Kearney should be deemed to have ratified the Mainline Agreement based on her receipt and retention of the money paid her under the Mainline Agreement once she was apprised of all pertinent circumstances. Mr. Kearney argues specifically that statements by Ms. Kearney in two e-mails to a friend establish that, by June of 2007 (after Mr. Kearney had moved out), she was aware of facts entitling her to rescind or invalidate the Agreement. Mr. Kearney further asserts that Ms. Kearney received the second and third million-dollar installment payments under the Mainline Agreement after June of 2007, directed investment of the funds (telling the bank the type of account in which to place the funds), and used interest earned on the funds for expenses (including attorneys’ fees related to the dissolution action) before she notified him on October 23, 2008, that she wanted to rescind the Mainline Agreement.[9]
Mr. Kearney asserts that the controlling principles on the issue of ratification[10] are set out in Hendricks v. Stark, 99 Fla. 277, 126 So. 293, 297 (1930) (holding rescission unavailable if contract has been ratified). In this decision, the court stated:
*388 “Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm. This doctrine seems to rest ... upon a distinct principle of public policy, that all that justice or equity requires for the relief of a party having such cause to impeach a contract is that he should have but one fair opportunity, after full knowledge of his rights, to decide whether he will affirm and take the benefits of the contract, or disaffirm it and demand the consequent redress.”
Id. at 296-97 (citation omitted; emphasis supplied). See also Zurstrassen v. Stonier, 786 So.2d 65, 71 (Fla. 4th DCA 2001) (“Ratification occurs where a party with full knowledge of all the material facts makes an affirmative showing of his or her express or implied intention to adopt an act or contract entered into without authority. The issue is one of fact.” (citation omitted)).
Mr. Kearney’s contention that Ms. Kear-ney ratified the Agreement rests on the disputed foundation[11] that Ms. Kearney accepted and retained the second and third million-dollar installments with full knowledge of all grounds for rescission. Even assuming for purposes of decision that Ms. Kearney retained the money after learning of Mr. Kearney’s misrepresentations, however, her possession of what she had the right to view as marital funds did not amount to ratification.
Contract principles are, of course, in play.[12] See Lashkajani v. Lash *389 kajani, 911 So.2d 1154, 1158 (Fla.2005) (“Valid prenuptial agreements regarding post-dissolution support are contracts.... [W]e enforce valid prenuptial agreements regarding post-dissolution support ‘as a matter of contract.’” (citation omitted)); Taylor v. Taylor, 1 So.3d 348, 350 (Fla. 1st DCA 2009) (stating a “trial court’s interpretation of a prenuptial agreement is reviewed de novo, as such agreements are governed by the law of contracts”). Florida courts recognize, however, “ ‘a vast difference between a contract made in the market place and one relating to the institution of marriage.’” Lashkajani, 911 So.2d at 1158 (citation omitted).
At the time Ms. Kearney notified Mr. Kearney that she sought to rescind the Agreement, the parties were still married. Rejecting the Mainline Agreement was not, therefore, incompatible with retaining the funds. If the Mainline Agreement had been valid, the funds in Ms. Kearney’s possession, although marital in origin, could be viewed as her separate property. But because, as the trial court later ruled, the Mainline Agreement was not valid, the funds were marital assets, and Ms. Kear-ney had a right to possession of the funds at least as great as Mr. Kearney’s right to possession of the funds. That Ms. Kear-ney did not “return” the funds after she asserted the right to rescind the Mainline Agreement does not dictate a finding that she ratified the Mainline Agreement.
We find merit, however, in Mr. Kearney’s argument that the trial court erred in denying him credit against the “prevailing party” fees and costs awarded in the final judgment for the temporary fees and costs he had previously paid. On July 8, 2009, Mr. Kearney was ordered to give Ms. Kearney $550,000 as “temporary” payment for her attorney’s fees. The July 8, 2009 order’s fee award was explicitly tentative and subject to revision: it reserved “jurisdiction to determine the ultimate allocation of attorney’s fees pending the resolution of the validity of the post-nuptial agreement and equitable distribution.” Similarly, on December 20, 2010, Mr. Kearney was ordered to pay Ms. Kearney’s litigation expenses (other than attorney’s fees) and costs incurred through November 15, 2010, not to exceed $250,000. The December 20, 2010 order also provided that the payment it required was “without prejudice to either party’s rights to allocate this amount ($250,000) and Husband’s prior payments to Wife’s attorneys of Five Hundred Fifty Thousand Dollars ($550,000) to either (i) equitable distribution; or (ii) Husband’s obligation for attorneys’ fees and costs pursuant to section 61.16, Florida Statutes; or (iii) the prevailing party provisions of the Agreement between the parties dated July 24, 2006.”
Against this background, paragraph 9 of the partial settlement agreement signed by the parties on June 8, 2011, ie., before “the ultimate allocation of attorney’s fees,” clearly and unambiguously states that each party shall be responsible for his or her attorneys’ fees and costs incurred in the dissolution action through the entry of final judgment, excepting only fees and costs associated with litigating the validity of the partial settlement agreement itself.
9. The parties shall each bear their own attorneys’ fees and costs associated with this Agreement and the above styled litigation through the entry of a Final Judgment resolving the remaining issues in this cause provided, however, that with respect to attorney’s fees and costs relating to the litigation of the postnuptial agreement, they are not resolved by this Agreement and shall be determined when the enforceability of the postnuptial agreement is resolved. In the event that legal action is filed or *390 arbitration is utilized by any party to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to an award of reasonable attorneys’ fees and costs.
Nothing in the partial settlement agreement exempts (or even addresses) the $800,000 in fees and costs “temporarily” paid by Mr. Kearney pursuant to the two earlier orders, and nothing suggests that fees and costs earlier and tentatively allocated fell outside the parties’ June 8, 2011 agreement regarding fees and costs. When the trial court made Mr. Kearney responsible for $797,223.06 in fees and costs under paragraph 9, therefore, he was entitled to credit for the $800,000 he had already been required to advance.
On cross-appeal, Ms. Kearney argues that the trial court undervalued Mainline. But the trial judge acted within his discretion in accepting the opinions of Mr. Kearney’s experts, over the opinion of Ms. Kearney’s expert. See Erp v. Erp, 976 So.2d 1234, 1239 (Fla. 2d DCA 2008) (“There admittedly is a significant debate about when marketability discounts are appropriate in any proceeding requiring the valuation of a closely held corporation. ... [A] trial court should be accorded the discretion to determine whether a marketability discount should apply to the valuation of a closely held corporation in a dissolution of marriage case where the court is traditionally charged with achieving equity through the use of various remedies.”); Lahodik v. Lahodik, 969 So.2d 533, 535 (Fla. 1st DCA 2007) (noting “the appellate court does not assess whether it is possible to recite contradictory record evidence which supports arguments rejected below, nor does it retry the case or substitute its judgment for the trial court’s on factual matters supported by competent, substantial evidence”); Nichols v. Nichols, 907 So.2d 620, 623-24 (Fla. 4th DCA 2005) (rejecting former husband’s argument that the trial court erred in computing the value of the business asset because “the record reveals the Former Wife’s expert testified as to the value of this asset and provided the trial judge with extensive calculations on the matter” and the “fact the trial court accepted this value over that offered by the Former Husband is not the type of error that would allow this court to substitute our decision for that of the trial court”); White v. White, 717 So.2d 89, 90 (Fla. 3d DCA 1998) (“Here, the parties each presented expert testimony regarding their preferred valuation method. The court did not abuse its discretion in using one method as opposed to the other.”).
Ms. Kearney argues the trial judge committed a number of “legal errors, the broadest of which was its decision to treat Mainline as if it were a small professional association or sole proprietorship, the entire intangible value of which was inextricably linked to a single person.” She also argues the trial judge abused his discretion by ignoring competent substantial evidence of the most reasonable valuation methodology. Relying on testimony from her expert and ignoring Mr. Kearney’s experts’ testimony, she argues we are required to remand for entry of judgment holding Mainline has substantial “enterprise goodwill” that should be calculated on the basis of “the income/going-concern valuation method.”[13]
*391 Like the court in Erp, 976 So.2d at 1237, “we doubt that this issue is actually a legal issue.”
The decisions that judges make when valuing businesses in the context of a divorce are fact-intensive and usually heavily dependent upon the opinions of well-trained experts. The question is not whether the trial court can employ one method or another in valuing a business, but is more appropriately phrased as whether an expert may be permitted to testify and render an opinion based upon a valuation method that the expert claims to be acceptable within his or her profession. If the expert is permitted to so testify, then the trial court, as a finder-of-faet, should have considerable discretion in deciding to what extent it accepts or rejects the expert testimony.
Id. at 1237-88. Mainline’s value is a question of fact which the trial court resolved, in a finding which we are obliged to uphold, given competent substantial evidence in support.
Finally, we reject Ms. Kearney’s argument as to prejudgment interest, unpersuaded that the trial judge erred in denying her claim for prejudgment interest on the value of her share of Mainline for the period from the December 31, 2008 valuation date to the date of the final judgment. The parties’ third partial settlement agreement covered all remaining assets, except equity in Mainline. The parties agreed Ms. Kearney would receive cash and certain enumerated assets, and that Mr. Kearney would retain all other “Remaining Assets,” defined to include “the distributions of Mainline to Former Husband from the beginning of time through and including the Final Judgment of this Court.” “[A]warding prejudgment interest ‘is not to penalize the losing party, but rather to compensate the successful .claimant for losing the use of the money between the date he or she was entitled to it and the date of judgment. A corollary purpose is to prevent the judgment debtor from being unjustly enriched by the use of that money.’ ” Catalfumo v. Catalfumo, 704 So.2d 1095, 1100 (Fla. 4th DCA 1997) (citation omitted). Because the third partial settlement agreement included past, present and future distributions from Mainline to Mr. Kearney, the trial judge did not err in determining that it would be *392 inequitable to allow Ms. Kearney to receive prejudgment interest in addition, “especially where the [equitable] distributions [to the parties] are substantial” and in the absence of evidence that any passive increase in the value of Mainline after the parties’ third partial settlement agreement was executed exceeded Mainline’s distributions to Mr. Kearney.
That portion of the order on Mr. Kear-ney’s motion for rehearing denying his request to credit the $800,000 he had previously paid against the award of fees and costs in the final judgment is reversed, and on this issue alone the matter is remanded for further proceedings. In all other respects, every order challenged and the amended final judgment are affirmed.
RAY, J., concurs.
MAKAR, J., concurs in part and dissents in part with opinion.

. The motion for reconsideration was still pending when the third partial settlement agreement was signed by the parties on June 8, 2011, and when the third partial settlement agreement was adopted by the trial judge on July 13, 2011. The successor trial judge entered an order on December 20, 2011, denying the motion for reconsideration.

. Mr. Moyle, one of the lawyers who advised her, testified pressure had been exerted on her to sign, and that he sensed her husband’s reaction was of paramount concern to her. She wrote Mr. Moyle in an e-mail "that I would be due much more in the case of a divorce without the document,” but Mr. Moyle testified that it was not clear even to him how much more she would be giving up and that expert analysis would be necessary to evaluate the situation. Mr. Holloway, who met with Ms. Kearney later, did not know she had sought other counsel or that Mr. Moyle had withdrawn from representing her because he thought she was not competent to sign, but Mr. Holloway, too, advised her not to sign.

. After summarizing the testimony of a Dr. Ducas (who testified that Ms. Kearney believed her role was to submit to her husband and to get behind his mission in life; that she believed everything the husband told her; that the wife viewed the Mainline Agreement as merely one more in a string of documents she had been asked to sign for Mainline; and that she felt her assignment was to get the document signed off on by an attorney because that is what the husband and Mainline needed), the trial judge did state: "In sum, the Wife's internal psychological composition compelled her to sign the document and for that reason she signed against the advice of two attorneys.” However that may be, what is legally significant is that the trial judge found several, material misrepresentations that left Ms. Kearney without a clear picture of her financial circumstances.

. The original trial judge found: "[T]he combination of pressure and misinformation combined to deprive the Wife of an understanding that she was doing anything more than signing a document for the purpose of effecting Mainline’s recapitalization. Though her attorneys recognized the effect the document would have, misrepresentations from her Husband left her unwilling to accept their advice. Certainly, the Husband never told the Wife he wanted to provide for a settlement of marital assets should they divorce.”

. Mr. Novey testified that more than 80 different legal entities and taxable entities (including assets held in offshore trusts and real property in other countries) comprised the Kearney marital and non-marital estates, and that a contested hearing as to the classification and valuation of each of the assets could require three months.

. The original trial judge concluded the husband had not rebutted the presumption that he concealed information. The financial information given to the wife did not detail the debt associated with each particular asset or any income produced by the particular asset. The financial statement included money in an irrevocable off-shore grantor asset protection trust (the RSK trust) of which the husband and wife are beneficiaries. By its terms, the RSK Trust removed the wife as a beneficiary when she filed for dissolution of marriage. The extent and complexity of the husband's financial holdings could not be understood in a mere six-page disclosure (noting that at an earlier hearing, counsel informed the court that a final hearing on equitable distribution would take approximately three months due to the very complex nature of the parties’ holdings). The original trial judge found the wife’s knowledge of the company was superficial, and the husband failed to rebut the presumption of lack of knowledge by the wife of the husband’s finances at the time of the agreement.

.The record contains evidence that the distributions from Mainline in 2006 (before tax) were $ 15,128,534. In 2007, the year after the Mainline Agreement was executed, distributions totaled $23,347,365 (and Ms. Kearney presented evidence that Mainline did not distribute all available earnings). In 2008, Mr. Kearney testified he received some $18 million in distributions.

. The trial judge noted the wife received $3 million (equivalent to a few months’ distributions from Mainline) in exchange for her interest, even though no evidence was offered at the original Mainline agreement hearing as to any value for Mainline of less than $231 million — a ratio of 231:3 (77:1) based on Mr. Kearney's July 12, 2006 financial disclosure, and found that unfair and unreasonable. That Mainline was later valued at $43,063,800 as of December 31, 2008, mitigates (the ratio becomes 43:3 or 14:1), but hardly eliminates the unfairness and unreasonableness.
The trial judge also found it was unreasonable and misleading to cloak a postnuptial agreement in terms suggesting it was designed to help the business. Fair disclosure, the trial judge concluded, would have included disclosure by the husband that the agreement was intended to settle the parties’ assets upon dissolution.

. Ms. Kearney testified that Mr. Kearney chose the bank and set up the account for the initial $1 million deposit. Subsequently, there were two automatic transfers into the account — on July 3, 2007, and June 2, 2008. Ms. Kearney’s Motion for Temporary Relief, filed March 16, 2009, asserted that she offered to return the funds. She further asserted that although she had paid certain expenses from interest earned on the funds, principally attorneys’ fees, she had not invaded any portion of the principal. During the October 2009 hearing regarding validity of the Agreement, Ms. Kearney testified she did not do anything to manage the money in that account. When asked how much was in the account at that time, she answered there "is the three million and then there is some interest. I’m not sure how much.” During the final hearing, when asked if she had asked the bank to invest the funds, she testified she "asked them to keep it low risk."

. Mr. Kearney argues the trial judge erroneously relied on decisions that address ratification by a principal of an originally unauthorized act of an agent. In the order on appeal, the trial judge cited Frankenmuth Mutual Insurance Company v. Magaha, 769 So.2d 1012, 1022 (Fla.2000), and Ball v. Yates, 158 Fla. 521, 29 So.2d 729, 732 (1946). The trial judge cited the decisions for the following propositions:
"Before one may infer that a principal ratified an unauthorized act of his agent, the evidence must demonstrate that the principal was fully informed and that he approved of the act. Ball v. Yates, 158 Fla. 521, 29 So.2d 729, 732 (1946).... The principal is charged only upon a showing of full knowledge, and not because he had notice which should have caused him to make inquiry, which in turn would have brought to his attention the knowledge of the unauthorized act of the employee.... And, [wjhenever he is sought to be held liable on the ground of ratification, either express or implied, it must be shown that he ratified upon full knowledge of all material facts, or that he was willfully ignorant, or purposely refrained from seeking information, or that he intended to adopt the unauthorized act at all events, under whatever circumstances. [Oxford Lake Line v. First Nat'l Bank, 40 Fla. 349, 24 So. 480, 483 (1898).]”
Magaha, 769 So.2d at 1022 (quoting Bach v. Fla. State Bd. of Dentistry, 378 So.2d 34, 36-37 (Fla. 1st DCA 1979)).

. In considering whether a principal ratified an act of an agent or whether a party to the contract ratified a contract, courts have held that the party must have full knowledge of the material facts that establish the ground for rescission. The record on appeal contains competent, substantial evidence to support the trial judge’s finding that Ms. Kearney "had no information as to the misrepresentations and misstatements in the Agreement until after she initiated a divorce proceeding and began discovery.”
In June of 2007, Ms. Kearney acknowledged she had signed "what amounted to a post-nuptial agreement” and would “basically ... get very little in a divorce,” but there is no indication in the e-mails that Ms. Kearney was aware of the numerous misrepresentations and failures to disclose on the part of Mr. Kearney found by the trial judge to be a basis for invalidating the Agreement. Even though she retained counsel in the spring of 2008, she testified she was not prepared to divorce in April of 2008; instead, she felt she needed a lawyer because the threat was always there that Mr. Kearney was going to file for divorce. She also testified that she and Mr. Kearney were "getting along” and "having nice communications” in the summer of 2008, and she again had hope the marriage would survive. She testified she did not have information prior to October 2008 that would have led her to believe the business purposes stated by Mr. Kearney to have created a necessity for the Agreement were untrue or misleading in any way.

. Although valid prenuptial agreements regarding post-dissolution support are enforced "as a matter of contract,” the "difference is in the standard we use to determine the contract's validity. When deciding whether to enforce a prenuptial agreement, trial courts must 'carefully examine the circumstances’ surrounding the agreement because parties to a prenuptial agreement are not 'dealing at arm’s length.' ” Lashkajani v. Lashkajani, 911 So.2d 1154, 1158 (Fla.2005) (citation omitted). "[Cjourts may scrutinize nuptial agreements to ascertain that the parties acted without compulsion and based on full disclosure. Although contract principles play a role in dissolution proceedings, courts must remember that 'proceedings under chapter 61 are in equity and governed by basic rules of fairness as opposed to the strict rule of law.’ ” Id. at 1159 (quoting Rosen v. Rosen, 696 So.2d 697, 700 (Fla.1997)).

. Ms. Kearney argues the trial judge erred as a matter of law, but acknowledges that "there is no clear authority as to how to measure goodwill above and beyond the reputation of an individual practitioner nor is there clear authority as to how to value goodwill in a large commercial enterprise such as Mainline.”
Although Thompson v. Thompson, 576 So.2d 267 (Fla.1991) examined whether the *391 value of the husband’s professional association’s goodwill should be included as a marital asset, the supreme court’s analysis is instructive in the present context:
There is no specific consensus as to a definition of professional goodwill ... or what method or methods should be used to value professional goodwill....
Irrespective of the setting in which it is found, the meaning of goodwill does not change. It is property which attaches to and is dependant [sic] upon an existing business entity; the reputation and skill of an individual entrepreneur — be he a professional or a traditional businessman — is not a component of the intangible asset we identify generally as goodwill.
Hanson v. Hanson, 738 S.W.2d 429, 434 (Mo.1987)....
[[Image here]]
It should be emphasized that such goodwill, to be a marital asset, must exist separate and apart from the reputation or continued presence of the marital litigant.
[I]f goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual. Any value which attaches to the entity solely as a result of personal goodwill represents nothing more than probable future earning capacity, which, although relevant in determining alimony, is not a proper consideration in dividing marital property in a dissolution proceeding.
Taylor [v. Taylor, 222 Neb. 721, 386 N.W.2d 851, 858 (1986)].
Thompson, 576 So.2d at 269-70 (emphasis supplied). See also Schmidt v. Schmidt, 120 So.3d 31 (Fla.2013).