769 So.2d 1012 (2000)
FRANKENMUTH MUTUAL INSURANCE COMPANY, etc., Appellant,
v.
Ernie Lee MAGAHA, etc., et al., Appellees.
No. SC96384.
Supreme Court of Florida.
September 21, 2000.
*1014 J. Lofton Westmoreland and William R. Mitchell of Moore, Hill, Westmoreland, Hook & Bolton, P.A., Pensacola, for Appellant.
Paula G. Drummond, Pensacola, Florida, on behalf of Appellee Ernie Lee Magaha; and David G. Tucker, Janet Lander, and James M. Messer, Pensacola, Florida, on behalf of Appellee Escambia County, Florida, for Appellees.
Carole Sanzeri, Senior Assistant County Attorney, Pinellas County Attorney's Office, Clearwater, Florida, for the Florida Association of County Attorneys, Inc., Amicus Curiae.
LEWIS, J.
We have for review two questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit as determinative of a cause pending before that court and for which there is no controlling precedent. Specifically, the Eleventh Circuit has certified the following questions to this Court:
(1) UNDER FLA. STAT. § 125.031, WHICH REQUIRES APPROVAL OF THE BOARD OF COUNTY COMMISSIONERS FOR CERTAIN LEASE-PURCHASE AGREEMENTS, CAN A COUNTY BE HELD TO HAVE APPROVED A CONTRACT ABSENT FORMAL RESOLUTION AND BASED SOLELY ON ACTS AND OMISSIONS OF THE COUNTY COMMISSION? IF SO, WHAT STANDARD GUIDES THE CONSIDERATION OF WHETHER A COUNTY COMMISSION HAS "APPROVED" A CONTRACT OR AGREEMENT?
(2) IF THE LEASE-PURCHASE AGREEMENT HAS BEEN APPROVED, DOES THE NON-SUBSTITUTION CLAUSE IN THE LEASE-PURCHASE AGREEMENT THAT PROVIDES FOR A PENALTY UPON NON-APPROPRIATION AND EXPLICITLY DISCLAIMS USE OF REVENUES FROM AD VALOREM TAXATION VIOLATE ARTICLE VII, § 12, OF THE FLORIDA CONSTITUTION?
Frankenmuth Mutual Insurance Co. v. Magaha, No. 98-2962, slip op. at 10 (11th Cir. Aug. 25, 1999). We have jurisdiction. See art. V, § 3(b)(6), Fla. Const. As more fully explained below, we answer the first certified question in the affirmative and determine that a board of county commissioners may approve a lease-purchase agreement under section 125.031, Florida Statutes (1999), even absent formal resolution, if such board is not required by local ordinance or charter to take action by formal resolution, as is the status of the local charter here. Further, we outline a three-prong test to guide courts in determining whether an approval without formal resolution has occurred. Finally, we also answer the second certified question in the affirmative, as rephrased below, and determine that the nonsubstitution clause implicates article VII, section 12 of the Florida Constitution, notwithstanding the attempted disclaimer.

I. FACTS AND PROCEDURAL HISTORY
On September 6, 1995, Frankenmuth Mutual Insurance Company (Frankenmuth) filed a two-count complaint in the *1015 United States District Court for the Northern District of Florida, Pensacola Division, against both Escambia County, Florida, and Ernie Lee Magaha (Magaha), the Clerk of the Circuit Court for Escambia County. Frankenmuth sought declaratory relief in Count I of the complaint and injunctive relief in Count II. All three parties moved for summary judgment after participating in discovery, and the federal district court set forth the following facts in considering the parties' motions:
In May 1992 Escambia County Comptroller Joe Flowers signed a master lease agreement with Unisys Leasing Corporation ("Unisys"), under schedule 01 of which, Flowers agreed to lease-purchase a Unisys Model A-11 mainframe computer.[[1]] The schedule called for seven annual payments totaling $2,353,814.1 In July 1993, the parties signed a second schedule agreeing to add a Unisys imaging system for eight annual payments totaling $1,164,635.2 In May 1994, the parties signed a third schedule adding further equipment and restructuring the finance arrangement for schedule 01. This third schedule called for eight annual payments totaling $3,541,908.3
Note 1: Six payments of $304,112 and one payment of $529,142.
Note 2: One payment of $200,000, two payments of $120,000, three payments of $134,964, and a final payment of $319,743.
Note 3: One payment of $200,000, six payments of $419,008 and a final payment of $827,860.
Flowers signed each of these agreements as "Escambia County Comptroller." Although he warranted in paragraph 20 of the master lease that he had obtained a resolution of the "governing body" of the jurisdiction authorizing him to execute the lease, in fact, Flowers neither requested nor obtained the permission of the Escambia County Board of County Commissioners ("the Board" or "the County Commission") before signing the agreement.
The master lease contains a number of provisions relevant to this dispute. Paragraph 21 includes a "non-appropriation clause," which provides the lease will terminate in any given year if the "legislative body or funding authority" fails to appropriate funds to make the lease payments. The same paragraph also contains a "non-substitution clause," providing that, in the event of non-appropriation, Flowers agrees not to purchase or rent any substitute computer equipment for the balance of the appropriation period and the one following it. Finally, an addendum clarifies that nothing in the lease shall be construed to constitute a pledge of ad valorem taxes and that, in the event of default, the Lessor has no right to compel the County Commission to appropriate funds to make the lease payments.
The agreement continued without incident for several years after it was executed. Flowers used the equipment for a variety of municipal functions, including county payroll and central data processing services for the County Commission as well as the Road, Mass Transit and Solid Waste Departments. (Ken Gardner Depo. 23-24). In 1992 Unisys sold and assigned the lease to Chicorp Financial Services, Inc. Chicorp, in turn, sold it to Frankenmuth Mutual Insurance Company ("Frankenmuth")the *1016 current owner of the lease and the plaintiff in this case.
Although the County Commission and Flowers both regarded the Comptroller to be a fee officer4 rather than a budget officer, the evidence shows Flowers submitted his budget to the County Commission each year setting forth the fees he anticipated collecting, the expenses he anticipated incurring and any anticipated shortfall between the two. Each year Flowers requested [that] the County Commission appropriate funds to cover the shortfall, which for fiscal years ending 1992, 1993 and 1994, amounted to roughly half the Comptroller's total budget. In each of those years, Flowers listed, respectively, $301,563, $304,561[[2]] and $304,113 as a budget expense titled "Debt ServiceComputer." Each year, the Board appropriated Flowers' requested funds without question.[[3]]
Note 4: Under Florida law, "fee officers" are ones "assigned specialized functions within county government and whose budgets are established independently of the local governing body, even though said budgets may be reported to the local governing body or may be composed of funds either generally or specifically available to a local governing authority involved." § 218.31(8), Fla. Stat. (1993).
The County Commission had no direct knowledge of the Unisys computer equipment, however, until it began discussing implementing its own computer network system in 1993. By letter dated August 3, 1993 Flowers wrote to the Board's chairperson explaining his office already had a central data processing system and that the Board should adjust its plans to integrate that system. At a June 28, 1994 meeting the County Commission voted to amend its technology plan to make use of the Comptroller's computer equipment.
In late 1994, Flowers became the subject of considerable controversy when Escambia County lost millions of dollars in bad derivative investments made by Flowers' office. The political uproar led to a grand jury investigation and, eventually, a four-count indictment charging Flowers with malfeasance. Count Four specifically charged Flowers with malfeasance for entering into the Unisys lease in violation of Florida law. Flowers pled no contest and resigned from office.
Thereafter, on August 1, 1995, the Florida Legislature abolished the Office of Escambia County Comptroller by repealing the Special Act that had created it. See Ch. 95-529, Laws of Fla. As a result, Escambia County's elected Clerk of the Circuit Court, Ernie Lee Magaha, became responsible for the constitutional duties formerly held by the Office of Comptroller.5 In the aftermath of these events, Magaha and the County Commission obtained and reviewed, for the first time, the Unisys master lease and schedules signed by Flowers. After investigation and discussion, the County Commission determined the Unisys equipment was too old, too big, too expensive and too ineffective to serve the County's needs. The County Commission therefore advised Frankenmuth it *1017 would not make the 1995 schedule 02 and schedule 03 payments of, respectively, $120,000 and $419,000. The Commission further advised Frankenmuth it considered the lease void and unenforceable due to Flowers' failure to obtain approval before signing it.
Note 5: In most Florida counties, the Clerk of the Circuit Court serves a dual function: he or she manages the circuit and county court system and serves as "ex officio clerk of the board of county commissioners, auditor, recorder and custodian of all county funds." See Fla. Const. art. VIII, § 1(d). The Florida Constitution also provides, however, that individual counties may choose to divide the Clerk's duties between two county officers, one managing the courts and the other serving as custodian of county funds. Fla. Const. art. V, § 16. In 1972, Escambia County chose to divide the duties between two elected officers: a Clerk of the Circuit Court and a Comptroller. See Ch. 73-455, Laws of Fla. When the Legislature abolished that Act, the duties of the Comptroller reverted to the Clerk of Court.
Consequently, in September 1995, Frankenmuth filed this suit asking the court to declare the lease agreement valid and enforceable and to enjoin the County Commission and the Clerk of Court (as constitutional successor to the Comptroller) from breaching the agreement. While the case proceeded through discovery, the County Commission purchased, in April 1996, a replacement computer system. As a result, Frankenmuth now seeks declaratory relief only. These motions for summary judgment followed.
Frankenmuth Mut. Ins. Co. v. Magaha, 10 Fla. L. Weekly Fed. D340, D340, 1996 WL 571042, *1 (N.D.Fla. Aug. 30, 1996).
After considering the above-listed facts, the federal district court made several determinations. See id. at D341-43, 1996 WL 571042, **1-2. First, the court determined that even though the County Commission had not approved the lease-purchase agreement prior to its execution as required by section 125.031, Florida Statutes (1993), the Commission had subsequently approved the agreement by (1) appropriating funds to pay for computer equipment; (2) voting to change its own technology plan to integrate the computer equipment; and (3) taking no action after learning that an elected official in Escambia County had entered into a lease-purchase agreement in possible violation of section 125.031.[4]See Frankenmuth, 10 Fla. L. Weekly Fed. at D341, 1996 WL 571042, **3-5. Second, the court determined that the agreement's nonsubstitution clause rendered illusory both the non-appropriation clause and the express disclaimer regarding ad valorem taxation, thus causing the agreement to be void as violative of article VII, section 12 of the Florida Constitution. See Frankenmuth, 10 Fla. L. Weekly Fed. at D341-42, 1996 WL 571042, **5-6. Third, the court determined that the nonsubstitution clause was void as against public policy because the clause "effectively contracted away the taxpayers' right to a central data processing *1018 system for up to two years." See id. at D342. However, the court further determined that the nonsubstitution clause was properly severable from the remainder of the agreement. See id. Finally, the court determined that Magaha had no contractual obligations to Frankenmuth. See id. at D343, 1996 WL 571042, *7. In accordance with theses determinations, the district court declared:
Escambia County's Board of County Commissioners ratified the lease and all schedules between Unisys and Joe Flowers, the Comptroller of Escambia County. As the County Commission has failed to appropriate funds to make the lease payments, Frankenmuth may exercise its rights under the non-appropriation clause in paragraph 21 [of the lease-purchase agreement]. Frankenmuth may not enforce the non-substitution clause, however, because it is void for violation of Article VII, § 12 of the Florida Constitution and for violation of public policy. Frankenmuth has no contractual rights against Ernie Lee Magaha, Escambia County's Clerk of the Circuit Court.
Id. at D343, 1996 WL 571042, *7. Frankenmuth appealed to the Eleventh Circuit, and Escambia County cross-appealed. See Frankenmuth, No. 98-2962, slip op. at 2.
On appeal, the Eleventh Circuit discussed the issues regarding the execution of the lease-purchase agreement and the validity of the nonsubstitution clause. See id. at 5-9. After discussing these issues, that court certified for this Court's consideration the two questions of law set forth above. Id. at 10. We now address those questions in turn.

II. ISSUES AND ANALYSIS

A. THE FIRST CERTIFIED QUESTION
In the first certified question, the Eleventh Circuit has asked us to determine whether, consistent with the requirements of section 125.031, Florida Statutes, a board of county commissioners may approve a lease-purchase agreement absent formal resolution, and, if so, what standards guide consideration of whether such an approval has occurred. As explained below, we determine that a board of county commissioners may approve a lease-purchase agreement under section 125.031, even absent formal resolution, if a governing charter or ordinance does not require the board to take action by formal resolution, as is the situation here.[5] Further, we provide a three-prong test to guide the determination process as to whether an approval without formal resolution has occurred. Before we reach the first certified question, however, we must first address Frankenmuth's argument that Flowers, as the Comptroller of Escambia County, had the independent authority to enter into the agreement with Unisys even absent any approval whatsoever by the Escambia County Board of County Commissioners (the Board). If Frankenmuth's argument on this point is correct, then we need not reach the first question certified by Eleventh Circuit.
After careful consideration, we find Frankenmuth's argument regarding Flowers' independent authority to bind the governmental entity to be without merit. It is clear that Flowers, as Comptroller of Escambia County, was a constitutional officer under the Florida Constitution. See art. V, § 16, Fla. Const.; art. VIII, § 1(d), Fla. Const.; see also Alachua County v. Powers, 351 So.2d 32, 35-43 (Fla.1977). It does not follow, however, that Flowers had the independent authority to enter into the agreement at issue here. As we noted in Powers, the clerk of the circuit court-or the comptroller if duties are divided between two offices-derives authority and responsibility from both "constitutional and statutory provisions." Powers, 351 So.2d at 35; see also Escambia County v. Flowers, *1019 390 So.2d 386, 387 (Fla. 1st DCA 1980) (stating that Flowers' duties as comptroller were enumerated by legislative prerogative); cf. State v. Walton County, 93 Fla. 796, 800, 112 So. 630, 632 (1927) (noting that "[T]he board of county commissioners of each county are constitutional officers, and under the terms of the Constitution their powers and duties shall be fixed and prescribed the Legislature."); Weaver v. Heidtman, 245 So.2d 295, 296 (Fla. 1st DCA 1971) (observing that counties are "subject to legislative prerogatives in the conduct of their affairs"). By enacting section 125.031, the Legislature clearly established that agreements such as the one at issue here may not be entered into without approval by a board of county commissioners. This is not an instance where the clerk of the circuit court is acting as an arm of the judicial branch and thus under judicial control and not the control of the Legislature. See Times Publishing Co. v. Ake, 660 So.2d 255, 257 (Fla.1995). Therefore, the Legislature's pronouncement in section 125.031 is controlling here, and Flowers did not have the independent authority to enter into the agreement with Unisys without the approval of the Board.[6]
Turning now to the first question certified by the Eleventh Circuit, we must consider the text of section 125.031, Florida Statutes (1999):[7]
Counties may enter into leases or lease-purchase arrangements relating to properties needed for public purposes for periods not to exceed 30 years at a stipulated rental to be paid from current or other legally available funds and may make all other contracts or agreements necessary or convenient to carry out such objective. The county shall have the right to enter into such leases or lease-purchase arrangements with private individuals, other governmental agencies, or corporations. When the term of such lease is for longer than 60 months, the rental shall be payable only from funds arising from sources other than ad valorem taxation. Such leases or lease-purchase arrangements shall be subject to approval by the board of county commissioners, and no such lease or lease-purchase contract shall be entered into without said approval.
It is undisputed in this case that Flowers failed to obtain the express or formal "approval" of the Escambia County Board of County Commissioners (the Board) before entering into the agreement with Unisys. Therefore, the initial question we must answer is whether the Board had the power to approve the agreement after it was executed. We determine that Florida law clearly establishes that the Board had the power to approve, or, stated another way, ratify, that which was initially an unauthorized agreement after it had been executed. See, e.g., Ramsey v. City of Kissimmee, 139 Fla. 107, 111-13, 190 So. 474, 476-77 (1939); Brown v. City of St. Petersburg, 111 Fla. 718, 720, 153 So. 140, 140 (1933); cf. City of Panama City v. T & A Util. Contractors, 606 So.2d 744, 747 (Fla. *1020 1st DCA 1992) (holding that city ratified city manager's unauthorized termination of contract between city and third party); Tolar v. School Board of Liberty County, 398 So.2d 427, 428-29 (Fla.1981) (finding that municipality's action taken in violation of Sunshine Law could be later ratified if taken in accordance with such law); see generally 10A Eugene McQuillin, The Law of Municipal Corporations, § 29.104 at 63 (3d ed. 1999) ("It is a general rule that whatever acts public officials may do or authorize to be done in the first instance may subsequently be adopted or ratified by them with the same effect as though properly done under previous authority."). The dispositive question thus becomes, what constitutes "approval" by the Board within the meaning of section 125.031?
Section 125.031 does not define the term "approval" as used in the statute, nor does the legislative history underlying the statute shed any light on the matter.[8] Under such circumstances, we must give the statutory language its plain and ordinary meaning. See, e.g., Green v. State, 604 So.2d 471, 473 (Fla.1992) ("One of the most fundamental tenets of statutory construction requires that we give statutory language its plain and ordinary meaning, unless words are defined in the statute or by the clear intent of the legislature."). In ascertaining the plain and ordinary meaning of a term, reference may be made to a dictionary. See id. ("If necessary, the plain and ordinary meaning of the word can be ascertained by reference to a dictionary.").
In its opinion, the federal district court defined "approve" as "to have or express a favorable opinion of or "to accept as satisfactory." Frankenmuth, 10 Fla. L. Weekly Fed. at D341, 1996 WL 571042, *4 (quoting Webster's Ninth New Collegiate Dictionary at 98 (Merriam-Webster Inc. 1991)). In addition to the definition adopted by the federal district court, the dictionary definition of "approve" also includes "to give formal or official sanction to." Webster's Tenth Collegiate Dictionary at 57 (Merriam-Webster Inc.1996). Thus, the dictionary shows that the term "approve" may consist of either an informal or formal expression of assent.
Florida case law[9] also establishes that an approval or ratification can occur without formal resolution. For example, in Deutsche Credit Corp. v. Peninger, 603 So.2d 57, 58 (Fla. 5th DCA 1992), the court stated, "Ratification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority." Similarly, in City of Panama City, the First District determined that the city commission had ratified the city manager's unauthorized termination of a contract between the city and a third party-even though the city commission did not pass a formal resolution terminating the contract-where the city commission knew the reasons for the termination and then voted to award the contract to a third party. See 606 So.2d at 747; see generally 10A McQuillin, § 29.106 at 82 (stating that ratification of a municipal contract may occur "by the affirmative action of the proper officials, or by any action or nonaction which in the circumstances amounts to approval of the contract"); cf. Killearn Properties, Inc. v. City of Tallahassee, 366 So.2d 172 (Fla. 1st DCA 1979) (employing doctrine of estoppel to bar city from challenging validity of agreements on grounds of lack of proper formalities in the passage *1021 of such agreements). As a result, we determine that the term "approval" as used in section 125.031 does not require a board of county commissioners to pass a formal resolution, unless passage of such a resolution is required by the governing law of the county.[10] We do note, however, that several principles must be satisfied before a board of county commissioners may be deemed to have approved an agreement absent formal resolution.
First, we determine that an approval absent formal resolution must be made in compliance with Florida's Sunshine Law, which is of both constitutional and statutory dimension. See art. I, § 24(b), Fla. Const.; § 286.011(1), Fla. Stat. (1999). Under the Sunshine Law, any meeting at which official acts are to be taken must be open to the public, and no "resolution, rule or formal action shall be considered binding except as taken or made at such meeting." § 286.011(1), Fla. Stat. (1999); see also, e.g., Zorc v. City of Vero Beach, 722 So.2d 891, 896 (Fla. 4th DCA 1998) (interpreting Sunshine Law). As we previously have stated, "The intent of [the Sunshine Law] is to cover any gathering of the members of the Board where the members deal with some matter on which foreseeable action will be taken by the Board." Tolar, 398 So.2d at 428. Thus, for a board of county commissioners to approve a lease or lease-purchase agreement in accordance with section 125.031, we find it necessary that such approval be made "in the sunshine."
If an "approval" by a board of county commissioners of a lease or lease purchase agreement under section 125.031 must be made in accordance with the Sunshine Law, it necessarily follows that any subsequent ratification of such an agreement must also be made in compliance with the Sunshine Law. This is so because we have recognized that for a local government to properly ratify a previously executed, unauthorized agreement, the agreement must be ratified "in the same manner ... in which it might have been originally adopted." Ramsey, 139 Fla. at 113, 190 So. at 477; see also Broward County v. Conner, 660 So.2d 288, 290 (Fla. 4th DCA 1995) (interpreting Sunshine Law) ("If the county could not have entered into this contract without action taken at a meeting, it necessarily follows that the actions of the county's attorneys could not bind the county to specific performance of a contract in the absence of proper commission approval."). As stated by the First District in City of Panama City, the apparent policy justification for the requirement set forth in Ramsey is that "taxpayers should not be held accountable on a contract unless the contract has been entered into according to the strict letter of the law. Otherwise, corrupt (or merely inept) public officials could subject the public to untold financial liability." 606 So.2d at 747.
Second, in addition to the requirement that a subsequent approval in the form of ratification be made "in the sunshine" in the same manner that a formal approval would have required, there are several other general principles under-girding the concept of ratification warranting our attention. In the vintage opinion of Ball v. Yates, 158 Fla. 521, 527, 29 So.2d 729, 732 (1946), this Court stated, "Before ratification will be implied of an act of an unauthorized agent it must be made to appear that the principal has been fully informed and that he has approved." In Peninger, 603 So.2d at 58, the Fifth District Court of Appeal expounded upon the general pronouncement made by this Court in Ball:

*1022 An agreement is deemed ratified where the principal has full knowledge of all material facts and circumstances relating to the unauthorized act or transaction at the time of the ratification. G & M [Restaurants v. Tropical Music Service], 161 So.2d [556] at 558 [Fla. 2d DCA 1964]. See also Ball v. Yates, 158 Fla. 521, 29 So.2d 729 (1946), cert. den., 332 U.S. 774, 68 S.Ct. 66, 92 L.Ed. 359 (1947); Pedro Realty Inc. v. Silva, 399 So.2d 367 (Fla. 3d DCA 1981); Bach v. Florida State Bd. of Dentistry, 378 So.2d 34 (Fla. 1st DCA 1979). An affirmative showing of the principal's intent to ratify the act in question is required. [Carolina-Georgia Carpet & Textiles v.] Pelloni, 370 So.2d [450] at 452 [Fla. 4th DCA 1979]. Moreover, the issue of whether an agent's act has been ratified by the principal is a question of fact. One Hour Valet of America, Inc. v. Keck, 157 So.2d 83 (Fla. 2d DCA 1963).
Regarding the "full knowledge" requirement discussed in Peninger, the First District stated the following in Bach v. Florida State Board of Dentistry, 378 So.2d 34, 36-37 (Fla. 1st DCA 1979):
Before one may infer that a principal ratified an unauthorized act of his agent, the evidence must demonstrate that the principal was fully informed and that he approved of the act. Ball v. Yates, 158 Fla. 521, 29 So.2d 729, 732 (1946). It is generally the rule that the doctrine of constructive knowledge does not apply to bring about ratification. The principal is charged only upon a showing of full knowledge, and not because he had notice which should have caused him to make inquiry, which in turn would have brought to his attention the knowledge of the unauthorized act of the employee. 2 Fla.Jur.2d, Agency and Employment, § 52 at page 204 (1977).... There is no duty imposed upon the principal to make inquiries as to whether his agent has carried out his responsibilities. The principal "has a right to presume that his agent has followed instructions, and has not exceeded his authority." Oxford Lake Line v. First Nat. Bank, 40 Fla. 349, 24 So. 480, 483 (1898). And,
[w]henever he is sought to be held liable on the ground of ratification, either express or implied, it must be shown that he ratified upon full knowledge of all material facts, or that he was willfully ignorant, or purposely refrained from seeking information, or that he intended to adopt the unauthorized act at all events, under whatever circumstances. Id.

Based on the above principles well established in Florida jurisprudence, we determine that a three-prong test is appropriate for determining whether an after-the-fact "approval," or ratification, has occurred in satisfaction of section 125.031, Florida Statutes. First, a board of county commissioners must have the power to approve the agreement.[11]See, e.g., P.C.B. Partnership v. City of Largo, 549 So.2d 738, 740 (Fla. 2d DCA 1989) (determining that city did not have authority to enter into an agreement that effectively contracted away the city's police powers). Second, a board of county commissioners must ratify an agreement in the same manner in which the agreement would have been initially approved. For example, as we stated above, the approval must be made in accordance with the "Sunshine Law." Additionally, where a charter or ordinance requires a board of county commissioners to take action in a specified manner, such as by passing a formal resolution (unlike the circumstances here), *1023 then an after-the-fact approval must satisfy the specified manner to be valid. See Ramsey, 190 So. at 476-77, 139 Fla. at 111-13 (involving city charter requiring the city commission to take action on certain contracts by ordinance or resolution). Finally, in ratifying the agreement in the same manner in which it initially could have been approved, a board of county commissioners must have full knowledge of the material facts relative to the agreement. As we have not been asked to determine whether a proper ratification occurred in this case, we leave that question open for determination by the Eleventh Circuit based on the principles set forth above.

B. THE SECOND CERTIFIED QUESTION
The second certified question presented by the Eleventh Circuit has asked us to determine whether the nonsubstitution clause contained in the underlying agreement violates article VII, section 12 of the Florida Constitution, which provides:
Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation....
To more accurately reflect the procedural posture and underlying facts of this case, we rephrase the second certified question to read:

DOES THE NONSUBSTITUTION CLAUSE IN THE LEASE-PURCHASE AGREEMENT, WHICH REQUIRES UP TO A TWO-YEAR LAPSE IN COMPUTER SERVICES UPON NONAPPROPRIATION, VIOLATE ARTICLE VII, SECTION 12, OF THE FLORIDA CONSTITUTION, EVEN THOUGH THE AGREEMENT ALSO EXPRESSLY DISCLAIMS USE OF REVENUES FROM AD VALOREM TAXATION?
After careful consideration, we answer the second certified question, as rephrased, in the affirmative.
The 1968 revision to the Florida Constitution, which produced article VII, section 12 of the Florida Constitution, became effective on January 7, 1969.[12]See State v. County of Dade, 234 So.2d 651, 652 (Fla. 1970). Since that time, we have addressed the constitutional provision on several occasions. Escambia County asserts that our decisions in County of Volusia v. State, 417 So.2d 968 (Fla.1982), and Nohrr v. Brevard County Educational Facilities *1024 Authority, 247 So.2d 304 (Fla.1971),[13] support a finding that the nonsubstitution clause implicates article VII, section 12, while Frankenmuth attempts to distinguish Nohrr and County of Volusia, primarily relying on our decisions in Murphy v. City of Port St. Lucie, 666 So.2d 879 (Fla.1995); State v. School Board of Sarasota County, 561 So.2d 549, 553 (Fla.1990); State v. Brevard County, 539 So.2d 461 (Fla.1989); City of Palatka v. State, 440 So.2d 1271 (Fla.1983); and State v. Alachua County, 335 So.2d 554 (Fla.1976). In federal district court, the parties presented arguments similar to those presented here, and the court there determined that the nonsubstitution clause contained in Paragraph 21 of the agreement implicates article VII, section 12 of the Florida Constitution, and thus the agreement could not have been approved absent a voter referendum. See Frankenmuth, 10 Fla. L. Weekly Fed. at D342, 1996 WL 571042, *6. In essence, the court determined that the inclusion of the nonsubstitution clause transformed the agreement into a long-term certificate of indebtedness pledging ad valorem taxes. See id. at D341, 1996 WL 571042, *5. In making this determination, the district court engaged in the following analysis:
Like many long-term municipal lease agreements, the Unisys master lease contains a non-appropriation clause, providing that, if in any given year the governing body fails to appropriate funds to make the lease payments, the lease will terminate. (Master Lease ¶ 21). Such non-appropriation or non-renewal clauses are essential to prevent long-term municipal financing arrangements from being classified as debt under state law, thus triggering state-law requirements such as voter referendum. See M. David Gelfand, State & Local Government Debt Financing, § 3:17 at 32 (Clark Boardman & Callaghan 1993).
The Unisys lease also contains a nonsubstitution clause, providing that, in the event of non-appropriation, the Lessee agrees not to procure substitute computer equipment [or equivalent services] for the remainder of the appropriation period and the one following it. (Master Lease ¶ 21). Such clauses are a common method by which the lessor creates an economic disincentive for the municipality to exercise its non-appropriation rights. Gelfand § 3:17 at 32. As one commentator has noted, however, "there is considerable doubt about the enforceability of the non-substitution clause and its effect on the validity of the lease." Id. at 33. "[T]he inclusion of the non-substitution clause may be viewed as compelling the lessee to continue to appropriate funds throughout the full lease term, thereby rendering the optional features of the nonappropriation and nonrenewal clauses illusory." Id.

This court agrees a non-substitution clause may render a non-appropriation clause illusory, thereby requiring a lease to undergo Article VII, § 12 voter referendum. While Florida's courts have not addressed the precise issue, several decisions lead to that conclusion. In Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla. 1971), the court validated non-referendum revenue bonds that had been authorized to raise money to build educational facilities. The court deleted from the bonds, however, certain provisions that created a mortgage on the property, allowing the bondholders to foreclose in the event of default. The court reasoned the mortgage would "morally compel" the governing body to levy taxes to avoid foreclosure in the event bond payments could not be made from non-ad *1025 valorem revenue. Id. at 311. In effect, the mortgage provision amounted to a pledge of ad valorem taxes, which is invalid absent approval by the electorate.
Similarly in State v. Brevard County, 539 So.2d 461 (Fla.1989), the court approved a long-term lease-purchase arrangement which included an annual "renewal option" similar to the annual non-appropriation clause in the Unisys lease. The court rejected an argument that the financing arrangement violated Nohrr, but specifically noted the deal allowed the county to "terminate the lease without further obligation" in any given year. Id. at 463. Thus, the court reasoned, "[w]ith its `annual renewal option' under the lease, the county maintains full budgetary flexibility."
In contrast, a non-substitution clause denies the county "full budgetary flexibility" because it renders the non-appropriation clause illusory by compelling the municipality to make the lease payments or suffer a penalty. The Attorney General of at least one State has opined a non-substitution clause compels lease payments and creates debt. See La. Atty Gen. Op. No. 86-517, 1986 WL 236994;
Accordingly, the court must address two issues to determine the validity of the non-substitution clause in this case: (1) whether the risk of non-substitution would morally compel the County Commission to appropriate funds for the lease payments; and (2) whether those funds would come from ad valorem tax dollars.
A. Moral Compulsion
Had funds not been appropriated to make the Unisys lease payments, the evidence is undisputed the consequences of non-substitution would have been disastrous. The Unisys equipment provided the primary means for county payroll and central data processing for the County Commission and numerous other county offices. At deposition, Flowers made the following comments regarding non-substitution:
Q: What would happen?
A: If they took the equipment out, then we would be shut down. We wouldn't be able to operate.
Q: Why is that?
A: Because everything was on that computer.
(Flowers Depo. at 65). Given these facts, the court wastes little time finding the County Commission would feel morally compelled to appropriate funds to make the lease payments to avoid the risk of running county government without a central data processing ability for up to two years. In this regard, the non-appropriation clause is rendered illusory and the lease creates a multi-year debt.
B. Ad Valorem Taxes
A municipal debt does not trigger Article VII, § 12, however, unless it pledges ad valorem tax dollars as its source of payment. E.g. State v. School Bd. of Sarasota County, 561 So.2d 549, 552 (Fla.1990). In this case, the addendum to the master lease specifies no ad valorem taxes are pledged:
Nothing herein shall constitute a pledge by the Lessee of the full faith and credit of the Lessee, nor does the Lessee pledge any ad valorem taxes or other moneys other than moneys lawfully appropriated by the County Commission of Escambia County from time to time.... Lessor shall not have the right to require or compel the exercise of the ad valorem taxing power of, or the appropriation of any funds by the County Commission to obtain the payment or performance of any of the Lessee's obligations created by this agreement.
(Addendum ¶ 1).
Regardless of the above provision, the court finds the lease, and in particular the non-substitution clause, would inevitably require the County Commission to appropriate ad valorem tax dollars to make the lease payments. The case is *1026 similar to County of Volusia v. State, 417 So.2d 968 (Fla.1982), in which the municipality sought to secure bonds by pledging "All legally available sources of unencumbered county revenue other than ad valorem taxes." The supreme court reasoned this pledge, along with Volusia County's promise to do all things necessary to continue to receive the nonad valorem revenue, would inevitably lead to higher ad valorem taxes during the life of the bonds. The court denied validation, reasoning, "that which may not be done directly may not be done indirectly." Id. at 972; cf. Brevard County, 539 So.2d at 463 (refusing to apply County of Volusia to a case in which the municipality, unlike Escambia County in this case, "reserve[d] the right to terminate the lease without further obligation.")

County of Volusia applies squarely to these facts. The size of the lease payments together with the consequences of non-substitution indicate the County Commission would inevitably be forced to spend ad valorem taxes dollars to fund this lease. The addendum clause pledging otherwise is illusory. For these reasons, the court finds the non-substitution clause violates Article VII, § 12 of the Florida Constitution and is therefore unenforceable.
Frankenmuth, 10 Fla. L. Weekly Fed. at D341-42, 1996 WL 571042, **4-7 (footnote omitted).
We agree with the federal district court's thorough analysis regarding the nonsubstitution clause in the present agreement. While the addendum to the master lease agreement states that there is to be no pledge of ad valorem taxes to fund the payments due under the agreement, and further disclaims any right to compel the procurement of ad valorem taxes, this is not a case where there is a pledge of a specifically demarcated source of revenue to satisfy the underlying obligation. See Murphy, 666 So.2d at 881 (upholding bond validation where non-ad valorem taxes were pledged as a supplement to specifically demarcated source of revenue); City of Palatka, 440 So.2d at 1273 (validating bond where two specific non-ad valorem sources of revenue were pledged); Alachua County, 335 So.2d at 556-58 (validating bonds funded by pledge of revenue sharing funds and race track proceeds). More importantly, this is not a case where the county has retained "full budgetary flexibility." See School Board of Sarasota County, 561 So.2d at 552-53 (noting that school board could maintain "full budgetary flexibility" under terms of agreement);[14]Brevard County, 539 So.2d at 464 (noting that "annual renewal option" under lease-purchase agreement would allow county to maintain "full budgetary flexibility"). Instead, due to the expense and functionality of the computer equipment covered by the agreement here, the nonsubstitution clause interrelates with other lease provisions, see County of Volusia, 417 So.2d at 972, to "morally compel" the county to pledge ad valorem taxes to fulfill the obligations of the lease. See Nohrr, 247 So.2d at 311. Accordingly, we answer the second certified question, as rephrased, in the affirmative.[15]

III. CONCLUSION
As we have analyzed, the first certified question is answered in the affirmative *1027 upon our determination that a board of county commissioners may approve in the form of ratification a lease-purchase agreement under section 125.031, Florida Statutes, even absent formal resolution, where the board is not required by local ordinance or charter to take action by formal resolution. Further, we have established a three-prong test to guide the determination of whether an approval without formal resolution has occurred. Finally, we have responded to the second certified question as rephrased in the affirmative upon the determination that, based on the particular facts in this case, the nonsubstitution clause implicates article VII, section 12 of the Florida Constitution. Accordingly, we return the record in this case to the United States Court of Appeals for the Eleventh Circuit.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE and QUINCE, JJ., concur.
NOTES
[1] According to the master lease agreement, title to the computer equipment vested in Flowers, the lessee, with Unisys retaining a security interest in the equipment and the right to repossess the equipment. Also under the master lease agreement, Flowers generally accepted responsibility for all risks related to the equipment. An addendum executed by the parties in September 1992 abolished Unisys' security interest in the equipment and its right to repossess the equipment, instead substituting other available remedies in the event of default, including seeking compensatory damages from the lessee should the lessee refuse to (1) sell the equipment; or (2) voluntarily return the equipment (with legal and beneficial title) to the lessor.
[2] The actual amount listed in Flowers' letter to the Board of County Commissioners dated May 8, 1992, for "Debt ServiceComputer" actually was $301,561, not $304,561.
[3] Flowers' budget request for the fiscal year ending September 30, 1992, was made by letter dated June 6, 1991, almost one year before the agreement with Unisys was executed. Further, the amount listed in the 1991 budget request for "Debt ServiceComputer" was $301,563, similar to the annual payments called for under the Unisys lease agreement. Finally, Flowers' budget request for the fiscal year ending September 30, 1993, was made by letter dated May 8, 1992, also before the agreement with Unisys was executed. As noted in footnote 2, supra, the amount listed in the 1992 budget request for "Debt Service Computer" was $301,561, similar to the annual payments called for under the yet-to-be-executed Unisys lease agreement.
[4] To support this third finding, the federal district court stated: "[T]he evidence shows the accounting firm of Saltmarsh, Cleveland & Gund advised the County Commission through a 1994 independent audit that an elected official of the county had entered into a long-term lease agreement in possible violation of section 125.031." Frankenmuth Mut. Ins. Co. v. Magaha, 10 Fla. L. Weekly Fed. D340, D341, 1996 WL 571042, *4 (N.D.Fla. Aug. 30, 1996). The record shows that the independent auditing report stated, "Elected officials of the County have entered into lease purchase arrangements to obtain need property and equipment ... [that] appear to fall within the category of transactions which must be approved by the governing body of the County." This language is almost identical to that contained in the same auditing firm's 1991 report, which also did not specify what officials had entered into lease-purchase agreements in possible violation of section 125.031.
[5] The parties have not referred us to any provision in the Escambia County Code requiring the Board to take action in some specified manner.
[6] It is interesting to note that Flowers entered a nolo contendere plea to the charge of violating section 125.031, Florida Statutes; if Frankenmuth's argument were correct, then Flowers' plea would have responded to a charge having absolutely no basis in law. Further, Frankenmuth's argument on this point is inconsistent with language contained in the underlying agreement, which stated in paragraph 20(b): "Lessee [Flowers] has been duly authorized by the Constitution and laws of the applicable jurisdiction and by resolution of its governing body (which resolution, if requested by Lessor, is attached hereto), to execute and deliver this Lease and to carry out its obligations hereunder." If Frankenmuth's argument regarding Flowers' authority were correct, the language in the agreement regarding a resolution by the governing body of the jurisdiction would be superfluous and meaningless.
[7] We quote the current version of the statute because the Legislature has not amended the statute since 1989. See ch. 89-103, § 1, at 279, Laws of Fla. Thus, the current version of the statute is the same as the version in effect at the time the events in the present case transpired.
[8] The Legislature created section 125.031, Florida Statutes, in 1971, see chapter 71-240, section 1, at 1318-19, Laws of Florida, and, as stated in footnote 6, supra, has amended the statute only once since that time. See Ch. 89-103, § 1, at 279, Laws of Fla. (increasing time period implicating statute from 24 to 60 months). However, no legislative history surrounding these amendments sheds light on the meaning of the term "approval" as used in the statute.
[9] See, e.g., State v. Mitro, 700 So.2d 643, 645 (Fla.1997) ("In the absence of a statutory definition, resort may be had to case law or related statutory provisions which define the term....").
[10] We recognize that in reaching its decision in City of Panama City, the First District distinguished the process of ratifying entry into an agreement from the process of ratifying the termination of an agreement. See 606 So.2d at 747. However, the different policy concerns implicated in those distinguishable processes does not alter the conclusion that an approval or ratification of an agreement may occur absent formal resolution where the governing law of the county does not require action by formal resolution.
[11] As will be addressed in our discussion concerning the second certified question, Escambia County argues that the first prong of this test has not been met here because the Escambia County Board of County Commissioners allegedly did not have the power to initially approve the agreement. Specifically, Escambia County argues that (1) the agreement, based on its nonsubstitution clause, required approval by voter referendum due to its alleged practical long-term impact on ad valorem taxes; and (2) the nonsubstitution clause is not severable from the agreement.
[12] The predecessor constitutional provision to article VII, section 12, was article IX, section 6 of the Constitution of 1885, which was effective from 1930 until January 7, 1969. See State v. County of Dade, 234 So.2d 651, 654 (Fla.1970). That section provided:

The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, and the Counties, Districts, or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law; but the provisions of this act shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such Counties, Districts, or Municipalities.
Art. IX, § 6, Fla. Const. (1885). In numerous decisions, this Court held that various kinds of debts were not "bonds" for the purposes of the referendum requirement. See, e.g., State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 895-98 (Fla.1980) (discussing this Court's cases construing the predecessor constitutional provision); see generally Patricia M. Lee, Note, Bond Financing and the Referendum Requirement: Harmless Creative Financing or Assault on the Constitution?, 20 Stet. L.Rev. 989, 992-98 (1991) (same).
[13] In State v. School Board of Sarasota County, 561 So.2d 549, 553 (Fla.1990), this Court indicated that our prior decision in Nohrr construed the predecessor to article VII, section 12 of the Florida Constitution. However, after reviewing the opinion in Nohrr, it is clear that (1) the facts in that case took place after the 1968 constitutional revision became effective; and (2) this Court was construing the new constitutional provision in that case.
[14] In School Board of Sarasota County, we noted that the school board's failure to appropriate funds would result in "lease penalties," but that even with such penalties, the board maintained its "full budgetary flexibility." See 561 So.2d at 552-53. As set forth in our opinion in that case, the lease penalties included either purchasing the constructed facilities or surrendering possession of the facilities and the land upon which those facilities stood for the remainder of the lease term. See id. at 551. We emphasized, however, that the school board was "free to substitute other facilities for those surrendered." See id. Clearly, the presence of a nonsubstitution clause here distinguishes this case from our decision in School Board of Sarasota County, insofar as "full budgetary flexibility" is concerned.
[15] The federal district court determined that the nonsubstitution clause is severable from the remainder of the agreement, see Frankenmuth, 10 Fla. L. Weekly Fed. at D342, 1996 WL 571042, *6, but the Eleventh Circuit has not asked us to make a determination regarding severability. We decline to address the severability issue here, given that the issue is not novel and has not been fully briefed in this Court. We do note, however, that if the nonsubstitution clause is not severable from the remainder of the agreement, then the entire agreement must be invalidated as violative of article VII, section 12 of the Florida Constitution.