LEWIS, J.,
concurring in result only.
Restoration of the Everglades and environmental protection are topics of both great public concern and importance. Water quality, flood control, water supply, and ecosystem protection are critical concerns in Florida. The wisdom and desirability of positive steps to restore and protect our environment are beyond dispute. Governor Charlie Crist has proposed a bold vision for the future, and those involved in this work and movement should be commended. However, the wisdom, desirability, and vision of the underlying project are not considerations in the legal analysis of the validity of the proposed bond issue here. See Boschen v. City of Clearwater, 111 So.2d 958, 966 (Fla.2001) (“Moreover, the wisdom or desirability of a bond issue is not a matter for our consideration.”). I do recognize and acknowledge that my reading of Florida constitutional requirements and restrictions on long-term public debt payable from ad va-lorem taxation is not currently the majority view of this Court and, therefore, I must concur in result only.
The plan here is just another variety of the attempted devices to circumvent the Florida Constitution, as established by Florida citizens, and contains highly questionable aspects, such as the creation of an excess land “real property slush fund” referred to in the final judgment below as “valuable for future land swaps.” Additionally, the substance of this bond issue falls within article VII, section 12 of the Florida Constitution, which requires the approval of the voters in a referendum.
First, the final judgment below addressed, and oral argument confirmed, that a portion of the proposed project includes “land that will be valuable for future land swaps” without any attempt to define or disclose anything further for the purpose of that land in this bond issue. While flexibility and economic considerations may favor this type of undisclosed “slush fund” of real property, considerations for legal validity do not allow this nebulous “pot of land.” Not only does the law require more details or parameters, this “land swap” concept without bound *831 aries is certainly subject to abuse and mischief. The law of Florida with regard to public debt requires at least some detail with regard to all of the property purchased with the bond proceeds and, most certainly, more detail than just a “pot” of land for “future land swaps.” See State v. Suwannee Cnty. Dev. Auth., 122 So.2d 190, 193-94 (Fla.1960). While this is not fatal for the entire project, the real property in the “slush fund” for “land swaps” should not be approved. This is not sufficiently detailed to allow the public or the State to legitimately determine whether the future undisclosed and indeterminate “land swaps” are proper expenditures of public monies.
Second, and importantly, article VII, section 12, of the Florida Constitution requires that any long-term public financing payable from ad valorem taxes and maturing more than twelve months after issue be approved through referendum:
Counties ... special districts and local governmental bodies with taxing powers may issue bonds [and] certificates of indebtedness ... payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors
[[Image here]]
Art. VII, § 12(a), Fla. Const, (emphasis added).
The finding by the trial court and the bond argument advanced by the bond proponents here that the obligation to make payments under the proposed structure is only an annual obligation and does not extend more than twelve months is fantasy at the highest level. This phantom and illusory “walk away” argument is built on a foundation of straw. Those who seek public money, but to avoid public approval, have developed a variety of devices that create a “theoretical” illusion that there is a legitimate escape from the obligation to continue payments beyond twelve months. This “phantom” escape argument has been rejected by this Court in Frankenmuth Mutual Insurance Co. v. Magaha, 769 So.2d 1012 (Fla.2000). This Court has understood the necessity to look beyond the self-serving language and disclaimers of any long-term obligations to analyze the effect of the documents as applied and as a matter of practical reality. Just as the lease with a disclaimer of long-term obligations was held to be subject to article VII, section 12, in Frankenmuth, the practical and actual operation of this structure creates long-term payment obligations beyond twelve months. It is pure mental gymnastics to accept that as a practical matter the Water Management District could default at any time and simply “walk away” from the amount of money invested. Frankenmuth applies here.
In a similar manner, this non-income producing plan depends on ad valorem taxes to repay bondholders. The uncontra-dicted evidence from the Water Management District established that with the proposed involvement of federal funds and the integrated nature of the proposed expansive water restoration work, the Water Management District would not and could not simply “walk away” from this land purchase. In my view, the decision to issue bonds to fund a project without first obtaining approval through a constitutionally mandated referendum is contrary to the clear and plain words of article VII, section 12, of the Florida Constitution. Article VII, section 12, was clearly designed to address the expanding capital needs of local government, but was tempered by the inclusion of democratic control with regard to the decision to finance “capital projects” with long-term debt “payable from ad valorem taxation.” Art. *832 VII, § 12, Fla. Const. In this context, the majority’s avoidance of this clear command perpetuates and expands a distortion of our fundamental organic law, leads us beyond our prior precedent, and denies the voters of this State their constitutional right to determine whether their local governments should issue long-term debt that is “payable from ad valorem taxation,” as that phrase is understood through its “usual and obvious meaning.” City of Jacksonville v. Cont’l Can Co., 113 Fla. 168, 151 So. 488, 489-90 (Fla.1933) (“The words and terms of a Constitution are to be interpreted in their most usual and obvious meaning. ... The presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who have adopted them.”). With regard to typical “capital projects,” the Constitution unmistakably communicates that entities of local government are required to use a referendum to obtain voter approval when a pledge of ad valorem tax revenue or ad valorem taxing authority is a source of payment for relevant forms of long-term debt. See art. VII, § 12, Fla. Const.
I write separately in this context to emphasize two additional points that, in my view, demonstrate the violence that expansion of the legal fiction of State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla.1980), visits upon the plain text and manifest intent of article VII, section 12. First, much of our case law in this area has been opaque and counterintuitive due to its complete divorce from the text of this constitutional provision. Cf. Cont’l Can Co., 151 So. at 490 (“Constitutions import the utmost discrimination in the use of language, that which the words declare is the meaning of the instrument.” (emphasis added)). Here, the Court should not expand prior decisions from different contexts to advance a movement away from the text of article VII, section 12.
Second, article VII, section 10, of the Florida Constitution (“Pledging Credit”) further undermines application of the “pledge of taxing power only” premise of Miami Beach in the context presented here. This separate, distinct constitutional provision demonstrates that the framers of our Constitution were aware of, and intended a textual distinction between, an entity of local government “giv[ing], lend[ing] or us[ing] its taxing power or credit,” as addressed in that constitutional provision, and an entity of local government issuing “bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation,” as addressed in article VII, section 12. (Emphasis added.) If the framers had truly intended for article VII, sections 10 and 12, to each only address pledges of the taxing power of local government, then these constitutional drafters would have used similar language in section 12; however, they did not do so. Thus, the faulty premise of Miami Beach accomplishes that which we are proscribed from doing as judicial officers who have sworn to support, protect, and defend our state Constitution: It amends article VII, section 12, through judicial fiat by removing and rendering meaningless the phrase “payable from ad valorem taxation” and replacing it with materially different language drawn from a separate, distinct constitutional provision (i.e., article VII, section 10). Cf., e.g., Burnsed v. Seaboard Coastline R.R., 290 So.2d 13, 16 (Fla.1974) (“It is a fundamental rule of construction of our [Cjonstitution that a construction ... which renders superfluous, meaningless or inoperative any of its provisions should not be adopted by the courts.”).
As I have predicted before, like the hapless protagonist in “Groundhog Day,” this *833 Court will be forced to continuously relive this controversy until we “get it right,” because the constitutional provision at issue simply does not support the gloss placed upon it by Miami Beach, which has been erroneously expanded to this context, and related, distinguishable decisions. Sooner or later we must recognize that the faulty expansion of Miami Beach to far different cases involving typical capital projects unjustifiably perpetuates an obvious legal error and deprives Florida’s citizens of a clear constitutional right. Cf. Puryear v. State, 810 So.2d 901, 905 (Fla.2002) (“Our adherence to stare decisis ... is not unwavering. The doctrine of stare decisis bends ... where there has been an error in legal analysis.”).
When faced with a typical capital project, such as the land-purchase plan involved in this case, I would interpret and enforce article VII, section 12, as written and would also salvage and apply a long-forgotten portion of our Miami Beach decision: “The Court looks at the substance and not the form of the proposed bonds” to determine whether the entity of local government has complied with the Constitution. 392 So.2d at 894 (emphasis added). Where, as here, the bond-financing plan will inevitably lead to diverting funds from ad valorem tax revenue to pay for or “service” the associated long-term debt for a non-revenue producing capital project, the Constitution requires a referendum. See art. VII, § 12, Fla. Const.; see also Frankenmuth Mut. Ins. v. Magaha, 769 So.2d 1012, 1023-26 (Fla.2000) (holding that computer lease-purchase agreement, which would inevitably have required Escambia County to appropriate ad valorem taxes to make lease payments, violated article VII, section 12); County of Volusia v. State, 417 So.2d 968, 972 (Fla.1982) (“That which may not be done directly may not be done indirectly.” (citing State v. Halifax Hosp. Dist., 159 So.2d 231 (Fla.1963))). Political expediency cannot alter the text of the Florida Constitution nor should it be used to thwart the will of the voters of this State.
Consequently, I believe that expansion of the “pledge of taxing power only” premise of Miami Beach to typical capital projects violates article VII, section 12, and that any associated local-government bond-financing plan that will inevitably lead to diverting funds from ad valorem tax revenue to service related long-term debt requires a referendum under our state Constitution. Thus, even if we follow Miami Beach, this project nevertheless violates article VII, section 12. Unlike Miami Beach, which involved a redevelopment project under the auspices of the Community Redevelopment Act (part III of chapter 163, Florida Statutes (1975)), this case only involves a typical “capital project” within the meaning of article VII, section 12. Furthermore, in contrast to Miami Beach — where ad valorem tax revenue was only a contingent source from which the city planned to service the associated debt if the primary source proved insufficient — here, ad valorem tax revenue is the primary source from which the debt created by these bonds will be paid. This distinction brings the instant case squarely within the rule and rationale of County of Volusia and Frankenmuth: The referendum requirement cannot be circumvented because its bond-financing scheme inevitably requires that it pay for its debt with ad valorem tax revenue.
The local-government shell game, which is played to avoid the Florida voter, should not be sanctioned by this tribunal. Unfortunately, we have done so in the past and do so today by improperly expanding this game to the very “capital projects” addressed in article VII, section 12. Even good or great ideas that require long-term *834 public debt payable from ad valorem taxation must follow constitutional requirements. For these reasons, I can join in the result only, but reject the unjustifiable expansion of a fundamentally flawed principle, which operates to circumvent voter participation in a decision that requires popular vote approval under the Florida Constitution.