SALTER, J.
Dr. Marc Puleo, a judgment creditor of Yali Golan (also known as Eial Golan), appeals a final judgment denying Puleo’s fraudulent transfer claims against Yali Golan and his wife, Leslie Golan. Puleo argues that Yali Golan’s transfer of ten million shares of Scorpion Performance, Inc. (Scorpion), titled in Yali Golan’s name individually and reported as such in Scorpion’s stock transfer register and public filings with the U.S. Securities and Exchange Commission (SEC), to himself and his wife—at a time when Puleo’s substantial *39 monetary claim against Yali Golan had become evident—was a textbook example of a fraudulent transfer. We agree.
We disagree with the Golans’ argument (and the trial court’s conclusion of law based on that argument) that Puleo’s claim was barred by an unusual “Postnuptual Agreement” [sic] purportedly establishing Leslie Golan’s superior rights in the Scorpion shares. We reverse and remand the final judgment for further proceedings allowing Puleo to enforce his judgments against the proceeds of the Golans’ sale of the Scorpion shares.[1]
I. Proceedings Below
A. Original Lawsuit and 2007 Final Judgment
To report that the eleven year-old circuit court lawsuit has had many twists and turns would be a substantial understatement. It began in 2003 as a claim by Yali Golan that Puleo had breached an unwritten agreement with Golan “to share certain compensation, including stock' options granted to Puleo by PetMed Express, Inc.” (PetMed).[2] Puleo denied Yali Golan’s claims and ultimately prevailed as to all of them. In 2005, the late and veteran trial judge Roberto Piñeiro granted a partial summary judgment against Yali Golan based on the conclusion that any such alleged agreement was illegal and unenforceable under the Securities Act of 1934 and Florida law (PetMed was a publicly-traded company listed on the NASDAQ stock exchange and obligated to file disclosures with the SEC).
After Yali Golan amended his complaint to add additional theories, a successor judge was equally unpersuaded, finding among other things that “Golan was not able to act as an officer or director of PetMed because its investment bankers believed that [Yali] Golan’s prior felony conviction for narcotics distribution conspiracy could impede the ability of the company to secure investment capital.”[3] The court further found that at the time of PetMed’s registration in 2000, Yali Golan “held a 23% interest in PetMed, as the beneficial owner of shares held by a British Virgin Islands corporation called Double Diamond Trading, Inc.” These findings assume significance in the appeal at hand because they post-date the 1999 “Postnuptual Agreement” relied upon by the Golans as part of their defense to the later fraudulent transfer claim; the 2007 findings demonstrate that Yali Golan held and claimed interests in stock individually when he chose to do so.
In its final judgment of July 24, 2007, on the original claims of Yali Golan against Puleo, the court explained that agreements which violate the Securities Exchange Act of 1934 are void:
Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract ... heretofore or hereafter made, the performance of which involves the violation of ... any provision of this title or any rule or regulation thereunder, shall be void ... as regards the rights of any person who, in violation of any such *40 provision, rule, or regulation, shall have made or engaged in the performance of any such contract ....[4]
The final judgment reiterated that principle, two pages later:
A contract that is legal on its face will nonetheless not be enforced if its performance would violate the securities laws. See Berckeley Inv. Group v. Colkitt, 455 F.3d 195, 206 (3d Cir.2006); Regional Props. v. Financial and Real Estate Consulting Co., 678 F.2d 552, 561 (5th Cir.1982) (“That these contracts, under different circumstances, could have been performed without violating the Act is immaterial.”).[5]
The final judgment denied any relief to Yali Golan and reserved jurisdiction over Dr. Puleo’s claim for attorney’s fees and costs.
B. The SEC Filings, the Fee Motions, and the Scorpion Stock
In a recapitalization in April 2004, Scorpion stock certificate number 1039 for ten million shares was issued to Yali Golan individually. Those shares constituted 32% of the issued and outstanding stock. The Scorpion share transfer records admitted into evidence at trial also showed that no shares were issued to or held by Leslie Golan from that date through November 1, 2007. The other principal shareholders of Scorpion, Robert and Teresa Stopanio, also held ten million shares (and 32% of the issued and outstanding stock), but in their names as joint tenants. Scorpion’s October 12, 2007, public filing with the SEC reported that the only Golan shares were the ten million issued to Yali Golan individually.
Meanwhile, on August 21, 2007, Dr. Pu-leo filed his motion for attorney’s fees and costs against Yali Golan. The motion sought over $300,000.00 in attorney’s fees and costs. After a series of delays,[6] the third circuit judge assigned to the matter entered judgments in 2010 against Yali Golan for attorney’s fees and costs exceeding $365,000.00.
But a little over two months after Dr. Puteo filed his motion seeking attorney’s fees and costs, on November 2, 2007, the Scorpion stock transfer records indicate that Yali Golan surrendered (and Scorpion cancelled) certificate number 1039 in his individual name for ten million shares, receiving in exchange stock certificate number 2441 issued in the names of Eial Golan and Leslie Golan, joint tenants, for the same number of shares. Puleo’s attorneys learned of this as they sought to collect the judgments against Yali Golan. Discovery in the supplemental proceeding to collect those judgments disclosed that Leslie Golan made no payment for that transfer of ownership.
C. Further SEC Filings and the Fraudulent Transfer Claim
Just as Dr. Puteo filed his motion for attorney’s fees and costs, Scorpion was attempting to register its shares with the SEC. As part of those filings, Yali Golan signed a “lock up agreement”[7] on August 28, 2007, representing that he individually owned ten million shares of Scorpion. A February 2008 amendment by Scorpion to its Form 10-SB filed with the SEC stated *41 that Yali Golan individually owned ten million shares of Scorpion as of September 30, 2007. These documents did not mention Leslie Golan.
On May 2, 2008, however, Scorpion entered into an addendum to the lock up agreement with both Yali and Leslie Golan, and this was filed with the SEC. The addendum included a statement that “On November 2, 2007, Mr. Golan transferred all of his shares to himself and his spouse, Leslie Golan, as joint tenants.” Leslie Golan signed the addendum, thereby confirming the transfer of “his,” Yali Golan’s, ten million Scorpion shares to Yali and Leslie Golan as joint tenants, as part of a publicly-filed SEC document. On May 2, 2008, the Golans also sold back “their” ten million shares to Scorpion for $500,000.00 in cash and a promissory note and mortgage for $2,000,000.00.
In 2011, after confirming that Yali Golan had no individually-owned assets available for the collection of the judgments obtained by Puleo, Puleo moved to commence proceedings supplementary and to implead Leslie Golan as part of a fraudulent transfer claim. The motion was granted by the fourth circuit judge inheriting the case.
D. Trial and Judgment
A fifth circuit judge assigned to the case[8] heard the fraudulent transfer claims as a non-jury matter in June 2013. The final judgment denying Dr. Puleo’s fraudulent transfer claims stated that it was based on “the reasons stated on the record in open court.” A review of the transcript setting forth those reasons discloses that the trial court “started with the postnup-tial agreement which was entered into by the Golans on March 15,1999.” From that document, the court concluded that “[t]here is actually a contract between the two regarding their marital assets.” Acknowledging the evidence that Leslie Golan surrendered her five hundred Scorpion shares (and Yali Golan surrendered his five hundred shares) in the 2004 recapitalization for ten million shares issued solely in Yali Golan’s name, the court nonetheless found that “none of this divests Mrs. Golan’s interest,” and that “even if Mr. Golan had the intent to maintain these shares, himself, he did not have a legal right to do so” based on the postnuptial agreement.
This appeal followed.
II. Analysis
A. The “Postnuptual Agreement” [sic]
The “Postnuptual Agreement” is a remarkable document. It is not notarized or ■ witnessed. Purportedly executed on March 15, 1999, following the Golans’ marriage three months earlier, it includes a provision that the Golans’ “Individual Income Tax Return) [sic] for years 1998, 1999, are attached to this Agreement as Composite Exhibit ‘B’ which tax returns have been furnished in advance to and reviewed by Wife and her independent legal counsel.” This is puzzling, both because no tax returns were attached to the agreement in evidence, and because a 1999 individual income tax return would have been prepared and filed in 2000, not in 1999.
But that is merely a distraction compared to the language of the agreement relied upon by the Golans to prove that any and all of their property, no matter *42 how or when titled, is owned by them as joint tenants by the entirety:
3. Joint ownership of Property by the entirety
3,1For the purpose of this Agree? ment, and as used herein, the term ,. “Property” shall mean:
3.1.1 All assets whether real, or personal, tangible or intangible, owned by each party as of the date of their marriage (including assets acquired by each party hereto in their separate names while living outside the marital relationship) and all property .acquired in exchange for such property, including multiple exchanges;
3.1.2 All property hereafter acquired by each party by gift, devise, bequest or inheritance and all property acquired in exchange for such property, including multiple exchanges;
3.1.3 All proceeds, gains, refinancing or income derived, or to be derived from property owned by each party hereto as of the date of their marriage or acquired by girt, devise, bequest or inheritance whether the same be by sale, exchange, investment, disposition, refinancing, financing, reinvestment, ect., or attributable to enhancement or appreciation of said property is due in whole or part to market conditions or to the services, skills or efforts of wither party;
3.1.4 All earnings and accumulations resulting from each personal services, skill, efforts and work, together with all property derived therefrom,
3.2 Subject only to the term of this Agreement, each party hereto shall, during his or her lifetime, be joint tenants by the entirety of all of his or her respective Property and shall not have sole and exclusive right to dispose of any of such Separate Property during his or her remaining of lifetime’ by inter vivos or testamentary transfer, or by any and all other dispositions, and shall not have the sole and exclusive right to encumber, pledge or hypothecate the same, without an interference by or joinder of the other.
4. Joint tenancy by the entirety with rights of survivorship as to Separate Property.
4.1 As specifically provided in this Agreement, each party hereto will have joint rights, title and interest in any and all of the other party’s Separate Property with rights of survivor-ship.
4.2 In additional to the forgoing, the Husband and Wife agree that any assets of any value whatsoever, including stocks, cash, vehicles or real estate that Husband or Husband and Wife currently owned or that will be, may be or has been transferred to Husband or to wife from respective parents, and the appreciation from such assets, will be considered as joint marital asset by the entirety of Husband and wife.
[Sic; all errors are in the original].
The agreement also includes a paragraph purporting to exempt property titled in the name of one of the Golans (but supposedly actually owned by both Golans by virtue of the “joint tenancy” provisions) from indebtedness or liens incurred by the record titleholder,[9]
*43 Applying these unusual provisions to the Scorpion stock and the rights of Leslie Golan versus those of a known creditor of her husband, the legal question is whether the Golans could invoke the provisions to contradict their later actions and public securities filings. The recitals in the “Postnuptual Agreement” state that the Golans entered into the agreement “to resolve in advance any and all possible financial claims of any sort whatever which each might have.- Or might hereafter acquire, against the other party and/or the other party’s estate.” [sic]. The evident ptírpóse was to document their rights as - against one another, not as against later, non-party creditors.[10] There is no expression of any intention to affect the rights of any subsequent creditor of either or both of the Golans, and the existence and terms of the agreement were not recorded or made public, on this record, until Dr. Puleo asserted his fraudulent transfer claim against Yali Golan and Leslie Golan.
Further, the Golans’ actions were inconsistent with their supposed intention to hold all property as joint tenants. As already noted, when Yali Golan commenced his lawsuit in 2003 against Puleo relating to his alleged interests in compensation and stock options of PetMed, he neither disclosed a joint interest in such property by his .wife under the 1999 “Post-nuptual Agreement,” nor did he include her as a co-plaintiff. A year later, Yali Golan and Leslie Golan surrendered their certificate for 500 shares of Scorpion stock to the transfer agent in a recapitalization, in return for ten million shares issued to Yali Golan individually. This was followed by the public securities filings in 2007 acknowledging that the shares were his personal property. The securities filings made no mention of the “Postnuptual Agreement” or any property interest by Leslie Golan in the shares.
Finally, when the Golans and Scorpion amended the securities filings in May 2008 to indicate that the shares had been reissued in the names of Yali and Leslie G6-lan, it is conceded that Leslie Golan made no payment for the transfer and made no legal demand for the reissuance. The amendment confirmed, with Leslie Golan’s electronic signature, that the stock was held in Yali Golan’s name individually when- the final judgment was entered against him in his lawsuit against Puleo, and titled in his sole name when Puleo began actions to recover his attorney’s fees and costs in that lawsuit.
B. Proceedings Supplementary and Fraudulent Transfer Claim
“Proceedings supplementary are equitable in nature and should be liberally construed.” Mejia v. Ruiz, 985 So.2d 1109, 1112 (Fla. 3d DCA 2008) (citing Ferguson v. State Exch. Bank, 264 So.2d 867 (Fla. 1st DCA 1972)). By returning an unsatisfied writ of execution against Yali Golan and providing an affidavit to that effect—and identifying third persons to be impleaded—Puleo satisfied the requirements of section 56.29, Florida Statutes (2011), for the commencement of the proceedings supplementary against Leslie Go *44 lan. Section 56129 specifically applies to fraudulent transfer claims of the kind asserted here,- following entry of the final judgment establishing a transferor’s judgment debt. Amjad Munim, M.D., P.A. v. Azar, 648 So.2d 145, 150 (Fla. 4th DCA 1994).
Impleading additional parties under section 56.29 does not, however, “in and of itself imply liability, on the part of the impleaded third parties.” Mejia, at 1112. The impleaded parties are provided an opportunity to raise, their defenses and protect their interests.- In the present case, Puleo’s substantive claims against Leslie Golan (and for garnishment with respect to sums otherwise payable by Scorpion to Yali Golan or both Golans) are based on Florida’s Uniform Fraudulent Transfer Act, section 726.105, Florida Statutes (2007) (FUFTA). Under section 726.105(l)(b), Yali Golan transferred his ten million Scorpion Performance shares to joint names “[without receiving a reasonably equivalent value in exchange for the transfer,” and Yali Golan was engaged in a business or transaction (the liquidation of attorney’s fees and costs following the entry of judgment against him) for which his remaining assets were unreasonably small (here, nonexistent).
Yali Golan’s actual intent to hinder, delay, or defraud Puleo regarding' the collection of h'is judgment (section 726.105(l)(a), (2)(a)-(k)) may also be determined following a consideration of the so-called “badges of fraud,” whether:
(a) The transfer or obligation was to an insider. [In the present case, and under section 726.102, “insider” includes Yali’s wife Leslie].
(b) The debtor retained possession or control of the property transferred after the transfer. [Yali Golan concededly participated in the sale of the ten million shares to Scorpion on May 2, 2008, and received payments with Leslie Golan as part of the purchase price].
(c) The transfer or obligation was disclosed or concealed. [Puleo learned about the transfer as part of his discovery in aid of execution and review of public filings].
(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. [Yali Golan knew that Puleo’s claim had been made in the underlying lawsuit in July 2007, and the transfer occurred in November 2007 at the earliest].
(e) The transfer was of substantially all the debtor’s assets. [Based on the discovery in aid of execution and this record, Yali Golan’s only individually-owned asset available to satisfy the claim is the Scorpion stock and proceeds].
(f) The debtor absconded. [Yali Golan did not abscond].
(g) The debtor removed or concealed assets. [The Scorpion stock is the only asset of record removed from Yali Golan’s individual ownership].
(h)—(k) [These factors are inapplicable or have been addressed in the preceding list].
Based on the prima facie case made by Puleo under these provisions of FUFTA, the burden shifted to the Golans to prove that their transfer was not made to delay, hinder or defraud creditors. Jackson-Platts v. Gen. Elec. Capital Corp., 727 F.3d 1127, 1136 (11th Cir.2013); Treated Timber Prods., Inc. v. S & A Assocs., Inc., 488 So.2d 159, 160 (Fla. 1st DCA 1986). Because the Golans failed to provide such proof, Puleo was entitled to: avoid the transfer or obligation to the extent necessary to satisfy his claim; an attachment against the asset transferred or its proceeds; an injunction against further disposition of the Scorpion promissory note and *45 proceeds; and “any other relief the circumstances may require.” § 726.108.
III. Conclusion
The Golans’ postnuptial agreement may govern their claims against each other, but it is not a protective mantle insulating their public corporate transactions and filings from liability to a judgment creditor for a fraudulent transfer. We reverse and remand for the entry of judgment in favor of Dr. Marc Puleo against Yali Golan and the impleaded defendant Leslie Golan, and for further proceedings granting relief under section 726.108, Florida Statutes, to the extent of the uncollected balance of Puleo’s judgments.
Reversed and remanded.

.Following Yali Golan’s allegedly-fraudulent transfer of the Scorpion shares to himself and Leslie Golan, the two sold the shares back to Scorpion for $500,000.00 and a $2,000,000.00 secured promissory note. In January 2013, six months before the fraudulent transfer case against them came to trial, the Golans received a payment of over $845,000.00 in reduction of the note balance.

. Final Judgment of July 24, 2007, at 1-2, Golan v. Puleo, No. 03-6132-CA-02 (Fla. 11th Cir.Ct.2007), affirmed, 985 So.2d 1143 (Fla. 3d DCA 2008).

. Final Judgment of July 24, 2007, p. 4.

. Id., p. 5 (quoting 15 U.S.C. § 77c).

. Id., p. 7.

. Among other factors, a fee hearing was stayed pending Yali Golan’s (unsuccessful) appeal to this Court.

.Under such agreements, controlling shareholders agree not to "offer, sell, contract to sell, pledge, or otherwise dispose of” their shares for a one-year period following the effective date of the SEC registration.

. References to the number of assigned judges over the course of these proceedings are not a criticism. To the contrary, they explain the fact that the judge who tried the fraudulent transfer' claim did not have the benefit of the entire extensive record over the stages of the case and the course of years. In this case, Judge Piñeiro passed away; other judges were reassigned or unavailable; and the South Florida foreclosure crisis jammed the circuit court docket.

. The language is far from clear, including this provision: "If a debt or obligation of one party who is responsible for the debt or obligation shall indemnify and hold harmless the *43 other party from the claims or demand, including the indemnified party’s costs, expenses and reasonable attorney’s fees.” [sic],

. Our research has disclosed no Florida case in which the terms of a postnuptial agreement have been invoked to prove that an asset titled in the name of one spouse actually belongs to both as tenants by the entirety, and thus that the asset is immune from execution by a creditor of the titleholder. As one would anticipate, postnuptial agreements are instead analyzed to determine their validity and their effect on rights between the spouses in a later dissolution. See, e.g., Kearney v. Kearney, 129 So.3d 381 (Fla. 1st DCA 2013); Parra de Rey v. Rey, 114 So.3d 371 (Fla. 3d DCA 2013).